UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
KENNETH MCMASTER,

                                        Plaintiff,


-v-                                     9:15-CV-578

L.W. LABARGE, S.D. LAMARE, and
K. ELLSWORTH,

                                        Defendants.
----------------------------------------------------x


**JURY TRIAL TRANSCRIPT, VOLUME I**
**BEFORE THE HONORABLE DAVID N. HURD**
June 11, 2019
10 Broad Street, Utica, New York



For the Plaintiff:

     BOSMAN LAW OFFICE
     201 West Court Street
     Rome, New York 13440
     BY:  **A.J. BOSMAN, ESQ.**


For the Defendants:

     OFFICE OF THE ATTORNEY GENERAL
     The Capitol
     Albany, New York 12224
     BY:  **BRIAN W. MATULA, ESQ.**
          **KEITH J. STARLIN, ESQ.**

*Hannah F. Cavanaugh, RPR, CSR, NYACR*
*Official United States Court Reporter*
*10 Broad Street*
*Utica, New York 13501*
*(315) 266-1176*

```
 1
 2
                    I N D E X   O F   T E S T I M O N Y
 3
 4
 5    Witnesses                  Direct    Cross    Redirect    Recross
 6    KENNETH MCMASTER              35       --        --         --
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          (Open court.  Time noted:  10:55 a.m.)

2          THE COURTROOM DEPUTY:  Please be seated.

3          THE COURT:  First of all, we have -- the defendants

4   have made a motion in limine.  I have not received a written

5   opposition from plaintiff's counsel, but I understand she wishes

6   to make an argument in opposition.

7          Ms. Bosman, if you wish.

8          MS. BOSMAN:  Yes, your Honor, I do.

9          THE COURT:  Okay.  Proceed.

10          MS. BOSMAN:  Would you like us to do argument from

11   the podium or at the table?

12          THE COURT:  At the table for this is fine.

13          MS. BOSMAN:  Okay.  Your Honor, with respect to the

14   first motion in limine, the defendants have sought to preclude

15   myself or the plaintiff from making any reference or eliciting

16   testimony from any witness concerning a blue code of silence or

17   a blue wall of silence or a thin blue line or any similar phrase

18   during trial.

19          I believe that that would be inappropriate in as much

20   as the -- it would put a restriction on the issue of the case

21   with respect to retaliation and the failure to intervene that's

22   directly at issue with -- in terms of the defendants in this

23   case supporting each other and not reporting what occurred.  And

24   that is -- that is evidenced in multiple occasions throughout

25   the records of this case.

1          With respect to the second motion that they are

2    seeking to inquire into the names of the crimes for which the

3    plaintiff is currently incarcerated, I -- I don't see how that's

4    relevant, your Honor.  I think it's probably more prejudicial

5    than probative.

6          The initial crime that my client was convicted on

7    which brought him to prison in the first place was robbery.  He

8    was later convicted of contraband and drug possession while in

9    prison and received a second sentence for which he's serving, I

10   think, 7 and a half years -- 13 years, excuse me.  So the

11   initial crime that he was into prison for had nothing to do with

12   the veracity for violence.  You know, I actually think it's more

13   beneficial to my client than detrimental with respect to his

14   original conviction for robbery, but I don't see how it's

15   relevant.

16         The third motion that the defendants have moved in

17   limine for would be to be permitted to inquire into plaintiff's

18   guilty violations or for providing false information to DOCCS

19   officials.  That is clearly patently improper.  There's no way

20   that that can be more probative than prejudicial, particularly

21   given the nature of the defendants' employment.

22              THE COURT:  Okay.  Thank you.

23              Mr. Matula.

24              MR. MATULA:  Your Honor, we put the basis for our

25   motions into our pretrial briefs, so I'll reiterate those

1  points.

2        But with regard to the criminal convictions first,

3  we're not seeking his original criminal conviction, we're just

4  seeking those that he's currently incarcerated for.  We're just

5  seeking the names.  We don't intend on inquiring into the

6  circumstances surrounding those convictions, so I believe that

7  that would be a compromise which would eliminate the prejudicial

8  nature of the names of the conviction.

9        With regard to the thin blue line or blue code of

10  silence or anything along those lines, the plaintiff's attorney

11  can certainly inquire into discussions between the defendants,

12  but by using terms like that it's playing to the jury's emotions

13  of current events and things that are inappropriate in this

14  particular case and that would therefore be extremely

15  prejudicial to the defendants.

16        Finally, with regard to the disciplinary violations,

17  the plaintiff has an extensive disciplinary history.  The only

18  convictions that we're seeking or the only violations we're

19  seeking are those of providing false information.  Again, we are

20  not intending to get into the merits of any of those, other than

21  to say that it was found that he had provided false information,

22  which goes directly to his credibility.

23        Thank you, your Honor.

24        THE COURT:  Thank you.

25        Currently pending is defendants' motion in limine to

 1   preclude and permit certain evidence at the trial.  Plaintiff

 2   has indicated his opposition.  Defendants first move to preclude

 3   plaintiff from testifying as to any, "blue code of silence," or

 4   offer any comments implying a custom or practice of correction

 5   officers to cover up or lie about wrongdoing.  Such testimony is

 6   irrelevant in this action, as no allegations of a conspiracy

 7   have been made.  In any event, testimony of this nature would

 8   also be prejudicial and, therefore, this motion will be granted.

 9            Defendants also request to be permitted to inquire

10   into the names of claims of conviction to show they are

11   felonies.  Plaintiff is currently incarcerated as a result of

12   criminal convictions of criminal possession of a controlled

13   substance third degree B felony, promoting prison contraband

14   first degree D felony, and attempted promotion of prison

15   contraband first E felony.  The nature of these particular

16   felonies are not relevant to the instant claim and thus the

17   request will be denied.  Defendants will be permitted to elicit

18   testimony regarding the number of felony convictions, but may

19   not inquire as to the name or nature of the felonies.

20            And, finally, defendant seeks a ruling allowing them

21   to ask plaintiff about DOCCS' disciplinary history as it relates

22   to false information.  According to defendants, plaintiff has an

23   extensive disciplinary history with several violations for

24   providing false information.  As this evidence directly relates

25   to plaintiff's credibility, this request will be granted and

1    such testimony will be permitted upon the laying of a proper

2    foundation.  Therefore, plaintiff's motion is granted in part

3    and denied in part, and you may both have an exception to the

4    rulings against you.

5              Now, all -- both counsel have received a copy of the

6    proposed preliminary jury instructions, Court's Exhibit 1.  Do

7    either counselor have any objections or requests with regards to

8    the proposed preliminary jury instructions?

9              MS. BOSMAN:  Your Honor, I would just want to bring

10   to the Court's attention, my client brought with him some

11   materials today, which would include three photographs which

12   were taken on the 17th of November of 2014.  I'd made a request

13   of Mr. Matula to provide the color photographs because you can't

14   see anything with the black and whites that were provided to my

15   client.  So we would just alert the Court that we've made that

16   request.

17             With respect to the preliminary instructions --

18             THE COURT:  Well, first of all, do you have the color

19   photographs that we're talking about?  If so, they ought to be

20   produced.

21             MR. MATULA:  Your Honor, this is quite literally the

22   first time I've ever seen these photographs.  They aren't Bates

23   stamped, which would suggest that they certainly didn't come

24   from my office.  So I told Ms. Bosman that I would check again

25   our discovery files upon a break and if there are color

1    photographs, we're happy to send them on.

2              THE COURT:  So noted.

3              Again, any objections or requests with regards to the

4    proposed preliminary jury instructions, Court's Exhibit 1?

5              MS. BOSMAN:  I just received it, your Honor, but

6    could I make a record that during voir dire I requested that the

7    Court make inquiry of the jury with respect to my client's

8    allegations of sexual assault because of the sensitivity of that

9    nature and I do not know whether or not the preliminary

10   statement of the Court makes any reference to the sexual

11   assault, so I'm just looking for that.  I don't see any -- I

12   don't see any reference to the sexual assault.

13             THE COURT:  It isn't in there.  You have noted it and

14   may have an exception.

15             MS. BOSMAN:  Thank you, your Honor.

16             THE COURT:  Okay.  Does the defense have any

17   objections or requests with regards to the preliminary charge?

18             MR. MATULA:  No, your Honor.  Thank you.

19             THE COURT:  We will now summon the jury.  I will give

20   them the preliminary charge and we will proceed with opening

21   statements by both counsel and I would anticipate we may then

22   take a break for an hour for lunch.

23             Summon the jury.

24             MS. BOSMAN:  Your Honor, also, Mr. Strum has joined

25   me.  I'm sorry he was not here earlier this morning.  I don't

 1  know if you want me to introduce him to the jury or not.

 2              THE COURT:  Yes, you may.

 3              (Jury present.  Time noted:  11:05 a.m.)

 4              THE COURT:  Okay.  Members of the jury, again, thank

 5  you for being with us.  Before we begin with opening statements

 6  in this case, I would like to give you just a few words of

 7  introduction.

 8              This is a civil case brought by the plaintiff,

 9  Kenneth McMaster, against six individual defendants, each a

10  correction officer or supervisor at the Upstate Correctional

11  Facility at the time of the alleged incident:  Correction

12  Officers L.W. LaBarge, S.D. Lamare, and K. Ellsworth; Correction

13  Lieutenant J.G. Tatro; and Correction Sergeants M.C. Tompkins

14  and C.S. Rowe.  The claims asserted in this case arise from

15  alleged events which took place on November 15, 2014, at the

16  Upstate Correctional Facility which is located in Malone, New

17  York.

18              There are multiple defendants in this case and each

19  defendant is to be considered individually.  In other words, you

20  could find all defendants violated plaintiff's rights; some did

21  and some didn't; or that none of the defendants violated

22  plaintiff's rights.

23              I will now give you some preliminary instructions to

24  consider while you're listening to this case and briefly explain

25  the claims to you.  I will instruct you on the law that you are

1    to apply to these claims in more detail after all the parties

2    have finished presenting their evidence.

3              First, the role of the jury.  Your duty as jurors is

4    to determine the facts of this case on the basis of the admitted

5    evidence.  Once you have determined the facts, you must follow

6    the law as I state it, and apply the law to the facts.  On these

7    legal matters, you must not take the law -- you must take the

8    law as given to you; that is, if any attorney states a legal

9    principle different from any stated in these instructions or the

10   final instructions, it is my instructions that you are bound to

11   follow.  You are not to consider one instruction alone as

12   stating the law, but are to consider the instructions as a

13   whole.

14             You should not concern yourself with the wisdom of

15   any rule of law.  You are bound to accept and follow and apply

16   the law as given to you, whether or not you agree with it.  In

17   deciding the facts of this case, you must not be swayed by

18   feelings of bias, prejudice, or sympathy towards any party.

19             Next, the evidence.  The evidence from which you will

20   find the facts will consist of the testimony of witnesses,

21   documents, and other things received into the record as

22   exhibits, and any facts that the parties agree to, or stipulate

23   to, or that I may instruct you to find.

24             Certain things are not evidence and must not be

25   considered by you.  I will list them for you.

1              One:  Statements, arguments, and questions by lawyers

2       are not evidence.

3              Two:  Objections to questions are not evidence.

4       Lawyers have an obligation to their clients to make objections

5       when they believe evidence being offered is improper under the

6       rules of evidence.  You should not be influenced by the

7       objection or by my ruling on it.  If the objection is sustained,

8       ignore the question.  If it is overruled, treat the answer like

9       any other.  If you are instructed that some item of evidence is

10      received for a limited purpose only, you must follow that

11      instruction.

12             Three:  Testimony that I've excluded or told you to

13      disregard is not evidence and must not be considered.

14             Four:  Anything you may have seen or heard outside

15      the courtroom is not evidence and must be disregarded.  You are

16      to decide the case solely on the evidence presented here in the

17      courtroom.

18             There are two types of evidence:  Direct and

19      circumstantial.  Direct evidence is direct proof of a fact, such

20      as testimony of an eyewitness.  Circumstantial evidence is proof

21      of facts from which you may infer or conclude that other facts

22      exist.  I will to give you further instructions on these, as

23      well as other matters, at the end of the case, but keep in mind

24      that you are to consider both direct and circumstantial

25      evidence.

1          Next, credibility of witnesses.  During the course of

2    the trial, you will have the opportunity to observe all of the

3    witnesses.  It will be your job to decide how believable each

4    witness was in his or her testimony.  You are the sole judges of

5    the credibility of each witness and the importance of his or her

6    testimony.  In making the determination of whether or not to

7    believe a witness, you should carefully examine all the

8    testimony of that witness, the circumstances under which he or

9    she testified, and any other matter in evidence to help you

10   decide the truth and the importance of that witness's testimony.

11         Next, the claims asserted.  The federal claims:

12   Plaintiff has asserted claims under federal law.  He has

13   asserted claims for excessive force, failure to intervene, and

14   retaliation under the United States Constitution.  I will now

15   describe plaintiff's claims and briefly explain what you should

16   consider while listening to the evidence that will be presented.

17         The law to be applied in this case is the federal

18   civil rights law, Section 1983 of Title 42 of the United States

19   Code.  Section 1983 provides a remedy for persons who have been

20   deprived by state officials of rights, privileges, and

21   immunities secured by the United States Constitution.

22         The plaintiff has the burden of proving each

23   essential element of his Section 1983 claims by a preponderance

24   of the evidence.  To prove an assertion by a preponderance of

25   the evidence means proving that it is more likely true than not

 1    true.  If you find that any of the essential elements of the

 2    plaintiff's Section 1983 claims have not been proven by a

 3    preponderance of the evidence, you must return a verdict for the

 4    defendant under consideration for that claim.

 5              To establish a 1983 claim, the plaintiff must show,

 6    by a preponderance of the evidence, each of the following three

 7    elements:  First, that the acts complained of were committed by

 8    the defendant under consideration while acting under color of

 9    state law; second, that in committing these acts, the defendant

10    under consideration deprived plaintiff of rights secured by the

11    Constitution; and third, that the acts of the defendant under

12    consideration were the proximate cause of the injuries sustained

13    by plaintiff.

14              With respect to the first element, it is undisputed

15    that the defendants were acting under the color of state law

16    while working as correction officers at Upstate Correctional

17    Facility.

18              Regarding the second element, plaintiff claims that

19    defendants L.W. LaBarge and S.D. Lamare deprived him of his

20    constitutional rights by using excessive force against him on

21    November 15, 2014.  He claims that defendants K. Ellsworth, J.G.

22    Tatro, M.C. Tompkins, and C.S. Rowe deprived him of his

23    constitutional rights by failing to intervene or protect him

24    when defendants L.W. LaBarge and S.D. Lamare used excessive

25    force against him on November 15, 2014.  Plaintiff also claims

1  that defendant L.W. LaBarge deprived him of his constitutional

2  rights by retaliating against him on November 15, 2014, for

3  filing previous grievances against L.W. LaBarge.

4       Pursuant to the third element of a Section 1983

5  claim, plaintiff must establish by a preponderance of the

6  evidence that for the defendant under consideration, the

7  excessive force used, the failure to intervene or protect, and

8  the retaliation, respectively, was a proximate cause of

9  plaintiff's physical or mental injuries.  An act is a proximate

10 cause of an injury if it was a substantial factor in bringing

11 about that injury, and if the injury was a reasonably

12 foreseeable consequence of the defendant's act.

13      Next, damages.  Plaintiff is seeking money damages

14 against each defendant for violation of his federal civil

15 rights.  Plaintiff is also seeking punitive damages from the six

16 individual defendants in their individual capacities.

17      Defenses:  Each defendant denies plaintiff's claims

18 against them.  Therefore, the burden of proof is on the

19 plaintiff, as I will explain to you in the final charge after

20 all the evidence is heard.

21      Next, the conduct of you, the jury.  Until the trial

22 is over, you are not to discuss this case among yourselves or

23 with anyone else, including members of your family, people

24 involved in the trial, news reporters, or anyone else with whom

25 you may come in contact with.  You may not permit others to

1    discuss the case with you.  If anyone approaches you and tries

2    to talk to you about the case, either here at the courthouse or

3    anywhere else, please let me know about it immediately.  This

4    includes the parties and the lawyers for the parties.  The

5    attorneys know they are not to speak with you and will not think

6    it is rude if you do not speak to them.  It does not look

7    appropriate for one side or the other to be speaking with any of

8    you, no matter how innocent or trivial that conversation might,

9    in fact, be.

10           It is equally important that you not read or listen

11   to any news reports of the trial.  If a newspaper headline or

12   news broadcast catches your attention, do not examine the

13   article or watch or listen to the broadcast any further.  The

14   person who wrote it or is reporting the story may not have

15   listened to all the testimony or may be getting information from

16   persons from whom you will not see here in court under oath and

17   subject to cross examination.  The report may emphasize an

18   unimportant point or may simply be wrong.  If you want, you can

19   have your spouse or a friend clip out any stories and set them

20   aside to give you after the trial is over.  I assure you that

21   when you have heard all the evidence, you will know more about

22   this case than anyone will learn through the news media, and it

23   will be more accurate.  You must base your verdict solely and

24   exclusively on the evidence received in court during the trial.

25           You, as jurors, must decide this case solely on the

1   evidence presented here within the four walls of this courtroom.

2   This means that during the trial you must not conduct any

3   independent research about this case, the matters or charges in

4   the case, the individuals involved in the case, or the places

5   where the events took place.  In other words, you should not

6   consult dictionaries, reference materials, search the internet,

7   websites, blogs, or use any other electronic tools to obtain

8   information about this case or to help you decide the case.

9   Please do not try to find out information from any source

10  outside the confines of this courtroom.

11         Until you retire to deliberate, you may not discuss

12  this case with anyone, even your fellow jurors.  After you

13  retire to deliberate, you may begin discussing the case with

14  your fellow jurors, but you cannot discuss the case with anyone

15  else until you have returned a verdict and the case is at an

16  end.

17         I know many of you use cell phones, the internet, and

18  other tools of technology.  You may not use these tools to

19  communicate electronically with anyone about the case.  This

20  includes your family and friends.  You may not communicate with

21  anyone about the case on your cell phone, through an e-mail,

22  text messages, or on Twitter, through any blog or website,

23  including Facebook, Instagram, Google Plus, Linked In, or

24  YouTube.  You may not use any similar technology or social

25  media, even if I do not specifically mention it here.  I expect

1  you will inform me as soon as you become aware of another

2  juror's violation of these instructions.

3          Finally, do not form any opinion until all the

4  evidence is in.  Keep an open mind until you retire to the jury

5  room at the end of the case to deliberate on your verdict.

6          If you want to take notes during the course of the

7  trial, you may do so.  However, it is difficult to take detailed

8  notes and pay attention to what the witnesses are saying at the

9  same time.  If you do take notes, be sure that your note-taking

10 does not interfere with your listening to and considering all of

11 the evidence.  Also, if you do take notes, do not discuss them

12 with anyone before you begin your deliberations.  Do not take

13 your notes with you home at the end of the day, be sure to leave

14 them in the jury room.

15         If you choose not to take notes, remember that it is

16 your own individual responsibility to listen carefully to the

17 evidence.  You cannot give this responsibility to someone who is

18 taking notes.  We depend on the judgment of the members of the

19 jury and you all must remember the evidence in this case.

20         The trial will now begin.  The parties will make

21 their opening statements, which are simply outlines to help you

22 understand the evidence as it comes in.  Opening statements are

23 neither evidence, nor arguments.

24         The plaintiff will then present his witnesses, and

25 counsel for the defendants may cross examine them.  Following

1  the plaintiff's case, the defendants may, if they wish, present

2  witnesses whom the plaintiff may then cross examine.  After all

3  the evidence is in, the attorneys will present their closing

4  arguments to summarize and interpret the evidence for you, and I

5  will instruct you on the law.  After that, you will retire to

6  deliberate on your verdict.

7        The trial will continue every day this week.  Unless

8  there's an unforeseen occurrence, the court session will be

9  9:30 a.m. to approximately 4:30 p.m. with a 15-minute recess in

10  the morning and afternoon sessions.  There will be approximately

11  a one-hour break for lunch starting between noon and 1:00 p.m.

12        You will now receive a copy of these preliminary

13  instructions, Court's Exhibit 1.  You may refer to these

14  exhibits throughout the trial.  However, as with your notes, if

15  any, you must leave these exhibits in the jury room at the end

16  of each day, and you may not discuss them with other jurors

17  until you have heard all of the evidence in the case and have

18  began your deliberations.

19        As I said, we will now start with opening statements

20  on behalf of both attorneys of the parties and then we will

21  break for lunch.

22        Do you wish to make an opening statement on behalf of

23  the plaintiff, Ms. Bosman?

24        MS. BOSMAN:  Yes, your Honor.  Thank you.

25        THE COURT:  You may proceed.

1          MS. BOSMAN:  Thank you.

2    OPENING STATEMENT BY MS. BOSMAN:

3          MS. BOSMAN:  Ladies and gentlemen of the jury, I also

4    want to introduce Robert Strum who is a law student with my

5    office for the summer.  He's an intern and he's from Syracuse

6    Law.

7          What an honor it is to be a juror.  The parties in

8    this case have entrusted you with finding the facts.  Nobody

9    else gets to do that in this case, not the judge, not me, not

10   the plaintiff, not the defendants.  You get to decide what

11   happened on November 15th of 2014.  The Constitution of the

12   United States, which is what is the fundamental underlying

13   principal here at stake.

14         Under the First Amendment, it provides that no state,

15   including state actors, such as the corrections officers who are

16   defendants here, can deprive someone of their right to free

17   speech.  What that guarantees in a prison context is that a

18   prisoner, an inmate, is protected in the sense that he can make

19   complaints about the conditions of his confinement, the people

20   that are supervising his confinement, or any other matter that

21   is of public interest and personal liberty.

22         The second amendment that's at issue here is the

23   Eighth Amendment.  And that's the amendment under the United

24   States Constitution that protects prisoners.  The United States

25   is unique in that manner.  Other countries around the world

1    don't protect inmates with the Constitution.  Once their liberty

2    has been deprived, they're not guaranteed that that punishment

3    will not be excessive or unusual.  So we have these rules and

4    those rules apply, and as the judge said, whether you agree with

5    them or not, the Constitution protects prisoners.  The

6    Constitution protects them from excessive force.

7              My client, Mr. McMaster, is going to testify as to

8    what occurred on that occasion.  And he alleges, and I think the

9    facts will support, the allegation that these defendants used

10   force on him, unnecessary and excessive.  What happened on

11   November 14th of 2014, is Mr. McMaster came to Upstate

12   Correctional Facility as a prisoner, as an inmate.  Frequently,

13   inmates are moved from one facility to another.  Maximum

14   facility inmates are sent to certain prisons and so forth.  And

15   you'll notice the prison guards that have accompanied Mr.

16   McMaster here today.  Until he's completed his sentence, he does

17   not have liberty under the law.

18              When he arrived at Upstate Correctional Facility, he

19   recognized Mr. LaBarge, the first defendant which you were

20   introduced to earlier.  Mr. LaBarge remembered him from two

21   years earlier when he had been at Upstate Correctional Facility.

22   And why did he remember him?  Because he had made a complaint.

23   He had made a grievance against him because of the way

24   Mr. LaBarge was treating him, which he said was not in

25   accordance with the rules and not appropriate, so he made a

1    complaint.

2            When he got back there in 2014 -- on November 15th of

3    2014 -- I keep switching the years, but it's November 15, 2014,

4    excuse me, Mr. LaBarge again engaged with my client and there

5    was a conflict.  Not physical -- it wasn't a physical -- this is

6    not about fighting.  This is not about physical -- in terms of

7    my client refusing anything physical.  This is about these

8    defendants using physical force on my client.  I want to make

9    that clear with respect to the evidence that you'll hear.

10           Mr. LaBarge said Mr. McMaster threatened suicide.  He

11   said he's got to come out of his cell, said he's got to go to

12   the infirmary.  Well, the infirmary doesn't have any cameras.

13   There's no surveillance cameras in the infirmary.  Mr. McMaster

14   consents to go to have his arms inspected because they had hit

15   his arms with batons, and you'll see evidence of that and hear

16   evidence of that, because he wouldn't put his hands back in the

17   door -- the cell door.  They hit his hands with a baton.  And

18   they took him -- six corrections officers took him to the

19   infirmary and said that he had to be under suicide watch.  After

20   they put him in that cell, they came back into that cell and

21   assaulted my client and the evidence will show that.

22           And then when the judge was talking about evidence,

23   as you understand, and you will understand, the evidence is not

24   only what you see and hear, it's also what's missing,

25   circumstances that your common sense will show to you that my

1   client is telling the truth, that he is absolutely testifying as

2   to what happened on that occasion, and that is a violation of

3   his rights under the constitution.

4          There isn't anybody that's more powerless in our

5   society than a prisoner.  They don't get to go where they want,

6   they don't get to eat when they want, they don't get to -- we

7   take those liberties away from them.  But the thing that stands

8   between us as a country, the United States of America, and the

9   things that our sisters, brothers, parents, grandparents fought

10  for and died for was fundamental principles.  And no one is

11  above the law, not even those who enforce the law, not even

12  those who watch our prisoners, who watch our inmates.  They are

13  also subject to the law.

14         Mr. McMaster will -- there's a videotape of his being

15  escorted to that infirmary on November 15th.  And then coming

16  back on November 17th -- it was Friday to Monday, I believe --

17  there's no video.  The time when he says that he had injuries,

18  the time that he says that these officers sexually assaulted

19  him, as well as physically assaulted him, there's no video.

20         And I suggest to you that it's appropriate for you to

21  consider the totality of the circumstances of this case and you

22  can find the facts and you can make sure that our constitution

23  is upheld and that the First Amendment and the Eighth Amendment

24  are protected.  And I am confident at the conclusion of this

25  case that you will find that my client's rights were violated

1    under the Constitution.

2            And in order to protect the Constitution and

3    individuals like my client who are in prison, who are under the

4    watchful eye of law enforcement officers and correction officers

5    who must uphold the law against each other, as well as in order

6    to protect the people that they have care, custody, and control

7    of, I think that you'll find at the conclusion of this matter

8    that Mr. McMaster was assaulted and that he will be entitled to

9    compensatory damages of some nature and punitive damages of some

10   nature in order to make sure it doesn't happen to anybody else,

11   to send a message to the defendants that you can't do this, no,

12   not even in the prison.  We're watching, juries are watching,

13   citizens are watching, the Constitution of the United States is

14   watching.

15           Thank you.

16           THE COURT:  Thank you, Ms. Bosman.

17           Mr. Matula, you may make an opening statement on

18   behalf of the six defendants.

19           MR. MATULA:  Thank you, your Honor.

20   OPENING STATEMENT BY MR. MATULA:

21           MR. MATULA:  Good morning.  This isn't a case about a

22   powerless inmate who was brutalized by correction officers.

23   This is not about you, the jury, finding the bounds of the

24   constitutional rights of a powerless inmate.  This is about a

25   manipulative lying inmate convicted of multiple felonies who has

1    no regard for what his word means.  I expect he's going to stand

2    up at that podium and sit down, take an oath, and then lie

3    through his teeth to you.  And for what purpose?  For money.

4    That's why we're here.

5            The plaintiff is here for money.  He's looking to

6    make money on an incident that never happened.  His attorney is

7    here advocating zealously for him and her purpose is to get

8    money for her client.  That's what this is about.  This isn't

9    about the Constitution and the bounds of that constitution.

10   This incident never happened.

11           On November 14, 2014, the plaintiff was transferred

12   into Upstate Correctional Facility.  Within one day he had three

13   violations already.  He had already violated the rules.  He had

14   violated the rules at 7:20 in the morning, at 11:30 in the

15   morning, and at 12:05.  Each of those cases -- the plaintiff

16   refused to follow the rules in each of those cases.

17           In SHU in Upstate, there are doors, and each of those

18   doors have hatches.  The hatches allow the corrections officers

19   to put the food tray in and for the inmate to hand the food tray

20   out.  And so what the plaintiff decided that morning was he

21   wasn't going to comply with that.  So at 7:20, he refused to

22   exchange the tray and then he was sticking his hands out through

23   the hatch.  He disagreed with whatever it was that that officer

24   was telling him to do, he refused to do that, he wouldn't bring

25   his hands in until the area supervisor had to come, talk to him,

1  and eventually he complied with that, and he was issued a

2  misbehavior report.

3          And then at 11:20 or 11:30, the same thing happened.

4  He refused to exchange the trays, he kept his hands out there,

5  again giving problems to the officers.

6          At 12:05, he did the exact same thing, hands out,

7  won't go back out.  This time, not only was the area supervisor

8  not able to get him -- to convince him to comply with the rules,

9  but they had to call Lieutenant Tatro.  Lieutenant Tatro at the

10 time was the Lieutenant responsible for safety and security at

11 Upstate.

12         So Lieutenant Tatro came down and he tried to

13 convince the plaintiff with his words to try to comply with this

14 facility rule.  Time after time direct orders were given, put

15 your hands inside the hatch, put your hands inside the hatch.

16 And what did this plaintiff do, the one seeking money here in

17 court?  He refused.

18         It came to the point that Lieutenant Tatro had to

19 order another officer to physically use a baton on his hands

20 because he refused to pull his hands in and comply with the

21 rules.  And did he comply after the first strike of the baton?

22 No.  Another order was given, pull your hands in the cell.  Did

23 he comply at that point?  No.  Six times he kept his hands out,

24 not listening to what the officers were doing or not listening

25 to what he was told to do.

1        So he finally pulls his hands in.  Sergeant Tompkins,

2   I believe, was able to slide the hatch closed to keep his hands

3   inside so they wouldn't keep coming back out.  And then at that

4   point, the hatch was closed and things went on.  Lieutenant

5   Tatro went back to what he was doing that day.

6        But no later than four hours later, Lieutenant Tatro

7   gets another call saying, you know, we have another problem with

8   McMaster.  Now, he's giving the guards and nurses a hard time.

9   And this time, he says he's going to harm himself and that he's

10  going to kill himself.

11       Lieutenant Tatro comes down, again trying to talk

12  with the plaintiff here.  And not just the words of officers or

13  nurses, but this plaintiff says to Lieutenant Tatro, I'm going

14  to kill myself.  And whether the plaintiff had on his mind some

15  sort of, you know, dark and powerful emotional response to his

16  transition where he truly believed that or whether he was just

17  trying to be manipulative and trying to get moved to a different

18  cell because he knows that that would force a move to a

19  difference cell, we don't know, but Lieutenant Tatro makes that

20  determination at that time that he needs to be moved to an

21  observation cell.

22       Any time there's a threat of self-harm or any time

23  there's a threat of suicide, the officers aren't trained to deal

24  with mental health issues, it has to be referred to the Office

25  of Mental Health who has staff in the facility.  So until

1  someone can be seen by a member of that staff, they need to be

2  removed from everything that they could use to possibly harm

3  themselves.

4          And so Lieutenant Tatro says we need to move you into

5  an observation room.  The observation room has nothing in it.

6  It's got a bed, a sink, a toilet, and the plaintiff has all of

7  his clothes removed and is given a gown or a smock and paper

8  slippers.  And the idea is until he can be seen by someone from

9  the Office of Mental Health, he needs to have everything taken

10 away that he could possibly use to hurt himself.

11         And so at that point when Lieutenant Tatro tells the

12 plaintiff, we need to move you into the OMH observation room,

13 again, the plaintiff doesn't comply.  The plaintiff refuses to

14 the point where they need to go -- Lieutenant Tatro arranges for

15 the CERT team to come.  A CERT team is a specially trained unit

16 of the facility which is designed -- which is trained to extract

17 inmates out of a cell when they refuse to go where they have to

18 go.  So that's in the process.

19         They even called medical to see whether they could be

20 authorized for the use of chemical agents, like pepper spray, if

21 that became necessary.  And so as those wheels were turning,

22 Lieutenant Tatro continued to try to talk him into voluntarily

23 agreeing to go along.  And ultimately, Lieutenant Tatro was

24 successful.  So the plaintiff left the cell and he's escorted

25 all the way up to the OMH cell.  That's on video.  So from the

 1    point of leaving the cell all the way up through to the OMH

 2    cell, that's all on video and you're going to see that.

 3            Lieutenant Tatro and Sergeant Tompkins were two

 4    sergeants and a lieutenant responsible for that escort, along

 5    with correction officers who were not sued in this case.  So

 6    they bring him up to the Office of Mental Health.  They bring

 7    him into the observation room and then what they do is they

 8    perform a strip frisk, which is taking everything -- they have

 9    the plaintiff undress himself, and you'll see that.  You'll see

10    him taking one item of clothes off, one item of clothes off.

11            And, again, Lieutenant Tatro gives him an order, take

12    off your wedding ring, take off your glasses, and he, again,

13    causes issue with the protocol and he refuses to give up his

14    wedding ring.  Ultimately, Lieutenant Tatro made an exception

15    for the plaintiff after calling his watch commander.  And the

16    plaintiff was locked into that room, you can see the door being

17    locked, and no one else in that room, and then these officers go

18    back to what they're doing day in and day out.

19            Lieutenant Tatro is part of the administration.  He

20    goes back and is called upon on different areas in the facility

21    as needed.  Sergeant Tompkins and LaBarge go back to nine

22    building, which you can see is -- it's a distance.  The repeated

23    assaults that he's going to be testifying to, we expect, are

24    impossible.  These men cannot go from one side of the facility

25    whenever they want to to just come back and perform these

1    assaults.

2           Officer Ellsworth over there didn't remember this at

3    all.  And reason is because in the video, you see that his only

4    role in this was holding a bag where the plaintiff's clothes

5    were put into the bag and then putting his bag and possessions

6    on a table.  That was the -- the conduct that's at issue here

7    for Mr. Ellsworth.

8           And even more so, Lieutenant Rowe over there wasn't

9    involved in the strip frisk, he wasn't involved in the escort.

10   What he was -- he was an area supervisor that would come through

11   the infirmary, along with several other buildings.  And so he

12   happened to perform a round for the infirmary that night and

13   that's how he's here, is that he happened to walk through the

14   infirmary that night.

15          Mr. LaBarge and Mr. Tompkins and Mr. Tatro all left

16   and that was it.  The door closed.  And then what we have is an

17   observation officer who was assigned.  So we have a non-party

18   witness who we think that you'll hear from this week who

19   literally sat outside of this plaintiff's room and wrote down

20   every 15 minutes what the plaintiff was doing.  Plaintiff is

21   laying in bed, plaintiff is sitting on the heater, plaintiff

22   appears to be sleeping.  So from the time that door closed until

23   the time he's let out of that room, every 15 minutes of what was

24   happening is taken down and recorded, and you'll see that in a

25   logbook.

1        Okay.  So this never happened.  The only proof that

2   you're going to hear is the words of a convicted felon with

3   everything to gain and nothing to lose.  There is no downside

4   consequence for him.  He can make these allegations day in and

5   day out and there's nothing stopping him from coming here and

6   trying to get some free money.

7        The burden of proof in this case, as the judge

8   already mentioned and as you'll hear more, is on the plaintiff.

9   It is not the defendants's obligation to show you every square

10  foot of video from everything.  If we produced the video or if

11  there was video of one minute, you know, suddenly the incident

12  would've happened where there wasn't a camera angle.  Okay?  The

13  burden is on them.

14        What is it that they're showing you that proves that

15  this happened?  There's certainly not any medical proof.  After

16  being beaten for -- three to four times and -- multiple times by

17  multiple officers and sexually assaulted with a baton, you'd

18  think that there would be a single document that would dictate

19  that there's a bruise or there's a scratch.  Look at the medical

20  records and see if you see anything that would suggest this

21  happened.  It never happened.

22        Thank you, your Honor.

23        THE COURT:  Thank you.

24        Okay.  Members of the jury, as I said, we are

25  going -- it's a little bit early, but not much, so we'll break

1   for lunch now and have our first witness back -- come back after

2   lunch and we'll probably start somewhere around -- a little

3   after quarter of 1:00 or 1:00, right around there.

4           And I remind you -- and if you want to go over the --

5   I will not read the preliminary instructions again, but don't

6   discuss the case, not among yourselves or anyone else you may go

7   out to lunch with.  If they ask you, just say I'm sitting on a

8   federal jury and when it's over, I will talk to you about it,

9   but right now, I'm prohibited from doing so.  So have a good

10  lunch and we'll see you back here about ten minutes to 1:00.

11          Mr. McBrearty.

12          THE COURTROOM DEPUTY:  Court stands for lunch and

13  recess.

14          (Jury Excused.  Time noted:  11:45 a.m.)

15          THE COURTROOM DEPUTY:  Once again, please remain in

16  the courtroom until the jury is in the jury room.

17          THE COURT:  Take your time.

18          THE COURTROOM DEPUTY:  Okay, folks.  About an hour

19  and we'll start getting everybody together.

20          (Court in recess.  Time noted:  11:45 a.m. to

21  1:06 p.m.)

22          THE COURT:  Are we ready to go?

23          MS. BOSMAN:  I have two matters to put on the record,

24  please, your Honor.

25          The first matter is that during the opening

1    statement, Mr. Matula indicated to the jury that I am in this

2    case because I want to make money and I think that that is a

3    gross misrepresentation, particularly in light of the fact that

4    Mr. McMaster proceeded pro sé until very recently and I was

5    assigned pro bono in this case.

6              THE COURT:  Yes, I agree.  That was a very

7    inappropriate remark on this matter.  She's appointed counsel at

8    the last minute to try the case and she's not going to make any

9    particular money out of this thing other than as a pro --

10             MR. MATULA:  And, your Honor, it was only -- I

11   thought that I had said that, and I intended to say that, she's

12   here to get her client money.  I certainly --

13             THE COURT:  You did not say it that way.  You said

14   she's going to make money and her client wants to make money,

15   that's why we're here.

16             MR. MATULA:  I respectfully disagree with the

17   statement on the record, your Honor.

18             THE COURT:  What else?

19             MS. BOSMAN:  I would ask that a curative instruction

20   be provided to the jury.

21             Second of all, the photographs that we'd discussed

22   earlier that my client has black and white copies of but not the

23   originals, Mr. Matula has just indicated to me that he believes

24   that they are from a separate incident at a different time in

25   the same facility in the same OMH room.  And my client indicates

1    that these were provided by the defendants as part of the

2    discovery in this matter.  So there is a discovery dispute with

3    respect to those photographs.

4           I can mark them, the copies that I have, and have my

5    client identify them if Mr. Matula is indicating he's not going

6    to produce color copies of those photos.

7           THE COURT:  Do it and if he wants to cross examine on

8    that issue, that's fine.

9           MR. MATULA:  And, your Honor, if there's any curative

10   instruction to be offered, I would just ask that the record be

11   checked and confirmed before such an instruction is offered.

12          MS. BOSMAN:  I have no objection to checking the

13   record.

14          THE COURT:  Okay.

15          MS. BOSMAN:  Can we have a read back?

16          THE COURT:  So noted.  Yes, you may.

17          Do you have any -- either counselor have any

18   objections for me advising the jury in view of your comment that

19   she's appointed counsel in this case?  Do you have any objection

20   to that, either one of you?

21          MR. MATULA:  I would ask that the Court check the

22   record before any statements are made.  I think that it's fair

23   game to say that the client is here for money.  It certainly was

24   not my intention to represent to the Court or anyone else that

25   Ms. Bosman -- I would personally apologize to the jury if

 1  that's, in fact, what I said.

 2          THE COURT:  Ms. Bosman, what do you have to say?

 3          MS. BOSMAN:  I would ask that the record be read

 4  back, you confirm the record, and the jury be provided a

 5  curative instruction with respect to that.

 6          THE COURT:  All right.  So we'll wait and see what

 7  the transcript is.  I'll ask the reporter to tell me what was

 8  said.

 9          And so we'll move on from there, but we won't do it

10  right now.  Is this your witness?

11          MS. BOSMAN:  He is, your Honor.

12          THE COURT:  All right.  Summon the jury.

13          (Jury present.  Time noted:  1:10 p.m.)

14          THE COURTROOM DEPUTY:  Please be seated.

15          THE COURT:  Ms. Bosman, you may call your first

16  witness.

17          MS. BOSMAN:  Your Honor, the plaintiff calls Kenneth

18  McMaster.

19          THE COURTROOM DEPUTY:  Mr. McMaster, sir, would you

20  please stand and raise your right hand?  And, sir, would you

21  please state your full name and spell your last name for this

22  record?

23          THE WITNESS:  Kenneth McMaster, M-C-M-A-S-T-E-R.

24          THE COURTROOM DEPUTY:  Thank you, sir.

25          K E N N E T H   M C M A S T E R, called as a witness

1    and being duly sworn, testifies as follows:

2              THE COURT:  Ms. Bosman, you may proceed.

3              MS. BOSMAN:  Thank you, your Honor.

4    DIRECT EXAMINATION BY MS. BOSMAN:

5    Q.   Good afternoon, Mr. McMaster.  Would you state your name

6    again and introduce yourself to the jury?

7    A.   My name is Kenneth McMaster, M-C-M-A-S-T-E-R.

8    Q.   And, Mr. McMaster --

9              THE COURT:  Move the mic a little closer and speak

10   up.

11   Q.   And speak slowly.  Okay?

12   A.   Yes.

13   Q.   Mr. McMaster, how old are you?

14   A.   43.

15   Q.   And where were you born?

16   A.   Brooklyn, New York.

17   Q.   And what year was that?

18   A.   '75.

19   Q.   1975?

20   A.   Yes.

21   Q.   Do you -- are you married?

22   A.   Yes.

23   Q.   What is your educational background?

24   A.   12th grade, high school diploma.

25   Q.   So you completed high school?

1  A.  Yes.

2  Q.  Do you have any children?

3  A.  One.

4  Q.  And can you tell the jury what the name of your child is

5  and the age?

6  A.  Kenneth McMaster Junior and he's 15.

7  Q.  And how long have you been incarcerated in the New York

8  State prison system?

9  A.  Since 2003.

10  Q.  And in 2003 you were convicted of robbery, correct?

11  A.  Yes.

12  Q.  And after you began serving your sentence, which was for

13  how long?

14  A.  It was five years.

15  Q.  For five years.

16      During that time, you were convicted again while you were

17  in prison, correct?

18  A.  Yes.

19  Q.  And can you tell the jury what you were convicted of while

20  you were in prison?

21  A.  They convicted me at a jury trial for promoting prison

22  contraband, attempted sale, and attempt to promote dangerous

23  contraband.

24  Q.  And did that involve a drug --

25  A.  Yes.

1  Q.   -- that contraband?

2  A.   Yes.

3  Q.   And did you receive a sentence for that drug that you were

4  convicted of?

5  A.   Yes.

6  Q.   And what was the sentence you received as a result of that

7  conviction for contraband while you were already in prison?

8  A.   They gave me 13 years for the B felony, 3 and a half to 7

9  for the D, and a year for the A misdemeanor when I finish my

10  sentence in the state.

11  Q.   Were you successful in passing any contraband while you

12  were in prison?

13  A.   No, I was not.

14  Q.   And the sentence that you received for the prison

15  contraband was longer than the one that you received for the

16  robbery?

17  A.   Yes.

18  Q.   So if you had not been convicted or charged with prison

19  contraband, you would've been out of prison already?

20  A.   Yes.

21  Q.   Where were you first placed, in what correctional facility,

22  when you were imprisoned?

23  A.   When I first came to the state?

24  Q.   Yes.

25  A.   I was in Coxsackie Correctional Facility.

1  Q.  And how long did you stay there, do you recall?

2  A.  No, I don't.

3  Q.  Do you recall where you were moved after that stay at that

4  correctional facility?

5  A.  No.

6  Q.  At some point in time in 2012 you were at Upstate

7  Correctional Facility, correct?

8  A.  Yes.

9  Q.  How long were you at Upstate Correctional Facility before

10  you left in 2012?

11  A.  Approximately 33 days.

12  Q.  So approximately a month you were at Upstate Correctional

13  Facility in 2012 --

14  A.  Yes.

15  Q.  -- is that correct?

16  A.  Yes.

17  Q.  During the time that you were incarcerated and held at

18  Upstate Correctional Facility, did you come to know defendant

19  LaBarge?

20  A.  Yes.

21  Q.  And can you tell the jury how it came about that you became

22  familiar with Corrections Officer LaBarge?

23  A.  Because one day he was doing chow where you get brown cups.

24  We was getting iced tea or juice for our lunch.  He have a habit

25  of whistling, as he say.  And he was whistling and he spit in my

1   juice.

2   Q.   Did you actually see him spit in your juice?

3   A.   Yes.

4          THE COURT:  Let's let the jury know, is Officer

5   LaBarge in the courtroom now?

6          THE WITNESS:  Yes.

7          THE COURT:  Could you identify him and would Officer

8   LaBarge, for the benefit of the jury, stand up?

9          THE WITNESS:  He the first defendant.

10         THE COURT:  So noted.

11         Okay.  Move on.

12  Q.   Now, at the time that you were in your cell and you saw

13  Officer LaBarge spit in your juice, did you have, like, a full

14  door of bars?  I mean, how could you see?

15  A.   Because we have a window.  There was a door -- the same

16  door they got -- with a window and they come in front of your

17  cell to serve chow.

18  Q.   And when chow is served, was this a lunch meal, a dinner

19  meal, a breakfast, what?

20  A.   It was a lunch meal.

21  Q.   Had he served you any meals prior to that date?

22  A.   No.

23  Q.   Had you had any contact with him or conflict with him at

24  any time prior to that lunch meal in 2012 when you first met

25  Mr. LaBarge?

1  A.   No, only when he walked -- because I seen him go -- he

2  walks to make rounds on company.  That was it.  I never said

3  nothing to him, never spoke to him, anything of that nature.

4  Q.   When he came to your cell to deliver your meal and spit in

5  your juice, did you say anything to him?

6  A.   Yes, I did.

7  Q.   Can you tell the jury what you said to him and what he said

8  to you?

9  A.   I asked him if he could give me a different juice or pour

10  the juice out, refill it, and stop spitting in the juice.  He

11  told me, no, that's the juice I'm going to get, that's the juice

12  he's handing to me, and therefore I have to take it.  I told him

13  I don't want to take it, can you go get the area supervisor,

14  which would be the sergeant.

15  Q.   Now, when you asked to see the area supervisor, is that

16  something that you're allowed to do as an inmate?

17  A.   Yes.

18  Q.   And under what circumstances are you to request to see the

19  area supervisor?

20  A.   If the correction officer's doing wrong and they're not

21  doing what they supposed to do or if you ask them for something

22  and he's not trying to do it, you could go to the higher rank

23  above them, which is the area supervisor or sergeant.

24  Q.   And once you ask a corrections officer to get an area

25  supervisor, are they obligated to do that for you?

1  A.  Yes, they supposed to.

2  Q.  And did Mr. LaBarge do that on that occasion when he spit

3  in your juice in 2012?

4  A.  No, he did not.

5  Q.  What happened?

6  A.  He went right by my cell --

7  Q.  Okay.

8  A.  -- and tried to force the juice in my cell.  I didn't take

9  it.  He went right by my cell.

10  Q.  What happened to the juice?

11  A.  It sat right there on my gate.

12  Q.  So then did you have further encounters with Mr. LaBarge

13  after that?

14  A.  Yes, I did.

15  Q.  Can you tell the jury what they were and what occurred?

16  A.  That same year or -- that same year?

17  Q.  Well, you were there for 30 days, you said.

18  A.  Yes.  After the incident with the juice, he be coming by my

19  cell whistling, telling me he can do whatever, stop writing

20  complaints, because I had wrote a grievance -- filed a grievance

21  about the incident and he told me it would not go nowhere.

22  Q.  So you filed a grievance about the incident with the

23  juice --

24  A.  Yes.

25  Q.  -- and your interaction with Mr. LaBarge?

1   A.   Yes.

2   Q.   And he --

3   A.   He came back, spoke to me about the incident.  It's obvious

4   that the grievance had got to the grievance supervisor.

5              MR. MATULA:  Objection, speculation.

6              THE COURT:  Overruled.  Go ahead.

7   A.   It got to the grievance supervisor, they did an

8   investigation, therefore --

9              MR. MATULA:  Objection, speculation.

10             THE COURT:  Yeah, just tell your conversation with

11  Officer LaBarge.

12  A.   Officer LaBarge came to me and let me know that the

13  grievance ain't going nowhere.

14             MR. MATULA:  Objection.

15             THE COURT:  No, overruled.

16             Go ahead, continue.  Tell us about your conversation

17  with Officer LaBarge.

18  A.   And after that, I never said nothing to Officer LaBarge.

19  He told me he would get me back for filing such a complaint.

20  Q.   So for filing a complaint against him, he said he was going

21  to get you back?

22  A.   Yes.

23  Q.   Did you have any other conversations during that 33 days

24  that you were at Upstate Correctional Facility in 2012?

25  A.   The day before I left, he asked about seeing my private

1  parts.

2  Q.   What do you mean?

3  A.   That's what I asked him, what do you mean.  He kept

4  constantly asking me.  He wanted to see my private parts and

5  he's going to get me one way or another for the complaint.

6  Q.   Okay.  So this is the day before you're to be transferred

7  out of the Upstate Correctional Facility, correct?

8  A.   Yes.

9  Q.   Did you know where you were going to be transferred to?

10  A.   No.

11  Q.   And he came to your cell?

12  A.   Yes.

13  Q.   And was it during a meal or just random or what?

14  A.   Random.

15  Q.   And he spoke to you through your --

16  A.   Door.

17  Q.   -- door?

18       And did he use the words, "private parts?"

19  A.   No, he used my --

20  Q.   Could you tell the jury exactly what Mr. LaBarge said to

21  you on that occasion regardless of the language?

22  A.   He wanted to see my dick.

23  Q.   And you said?

24  A.   No.

25  Q.   And you -- did you ask him why or what do you mean or

1  anything like that?

2  A.   No, I didn't.  I asked to speak to the area supervisor

3  again.

4  Q.   And how did Mr. LaBarge respond when you said I want to

5  speak to the area supervisor?

6  A.   He whistled and walked away.

7  Q.   When you say he whistled, can you describe for the jury how

8  he whistled?

9  A.   He do like a [untranscribable whistle sound], like that,

10  and just started walking away.

11  Q.   Have you heard Mr. LaBarge whistle at any other inmate?

12  A.   No, I have not.

13  Q.   Did Mr. LaBarge make any gestures to you on the day before

14  you were transferred out of Upstate Correctional Facility in

15  2012?

16  A.   Such as?

17            MR. MATULA:  Objection, leading.

18            THE COURT:  Sustained.

19  Q.   Other than the interactions that you've described to the

20  jury, do you recall any other interactions with Mr. LaBarge

21  during that time?

22  A.   No, I do not.

23  Q.   Now, can you tell the jury briefly what occurs when you

24  file a grievance when you're an inmate at the correctional

25  facility?

1  A.   You file a grievance, it goes to the grievance supervisor,

2  the grievance supervisor gives it to the area supervisor

3  depending on what type of grievance it is, and they supposed to

4  do an investigation.  Whoever is dealing with it is supposed to

5  speak to them.  If we have any witnesses, they ask the witness

6  what do they know, what did they see, what did they hear.  And

7  if there's video that we requested during our grievance, they

8  request to see the video.  If they feeling that they need more

9  evidence to prove what we write in the grievance against

10 correction officers or the -- how the cell is or our living area

11 is decent, they would ask for video and so forth like that.

12 Then it goes to the superintendent.  After the superintendent

13 reviews the evidence, he come up with a decision.

14      Then you appeal it and then it goes to Albany, which is

15 CORC.  And then Albany do an investigation from what they got as

16 evidence, send it back to the facility, and tell them however

17 they feel the grievance should be taken care of or if there's

18 any announcements or decisions per Albany.

19 Q.   Okay.  So when you file the grievance about Mr. LaBarge and

20 him spitting in your juice, did you also file a second grievance

21 about him asking to see your, quote, dick?

22 A.   Yes.

23 Q.   So you filed two grievances against Mr. LaBarge while you

24 were there during those 33 days?

25 A.   Yes, I have.  They consolidated the grievances.

1  Q.  So they combined them together?

2  A.  Yes.

3  Q.  Did anyone come to interview you about your complaints

4  about Mr. LaBarge?

5  A.  No.

6  Q.  Did you receive any kind of written documentation from

7  Albany or anyone else regarding the outcome of your grievance

8  against Mr. LaBarge?

9  A.  Yes, I got a written decision from the superintendent

10 telling me that he was doing an investigation.  And then I

11 appealed his decision and sent it to Albany.

12 Q.  Were you ever provided with a video of the events that you

13 described in your grievance regarding Mr. LaBarge?

14 A.  No, I have not.

15 Q.  Do you know whether or not the superintendent or Albany

16 looked at any video when they considered your grievance?

17         MR. MATULA:  Objection, speculation.

18 A.  No, I do not.

19         THE COURT:  His answer is he doesn't know.

20 Q.  Did you receive any misbehavior reports while you were at

21 Upstate in 2012 for 33 days?

22 A.  Yes.

23 Q.  How many misbehavior reports did you receive and what were

24 they for?

25 A.  Three.  Interference, direct order, and -- all three of

1  them came from Correction Officer LaBarge.

2  Q.   Did those three misbehavior reports that were issued to you

3  come before, after, or in between your grievances against him?

4  A.   In between.

5  Q.   So you'd made the grievance complaint about spitting in

6  your juice, correct?

7  A.   Yes.

8  Q.   And then you received three misbehavior reports?

9  A.   Yes.

10       MR. MATULA:  Objection.

11  Q.   Tell us about the first one that you received.

12  A.   The first one said that I was interfering with --

13       MR. MATULA:  Objection, hearsay.

14       THE COURT:  Overruled.  You may answer.

15  A.   During the chow run, that's when I had spoke to him and

16  told him stop spitting in the juice.  He wrote me up for that,

17  said that I was interfering.  He gave me a direct order to shut

18  up, which I didn't, I kept telling him I would like a different

19  juice.  He did the whistle and walked away.  He wrote me up for

20  that.

21       It went to the hearing, which was a sergeant -- I mean,

22  lieutenant, excuse me.  It went in front of the lieutenant, the

23  lieutenant did the hearing.  I asked for the video.  He

24  dismissed it at the hearing because there was no wrongdoing on

25  my behalf.  I wasn't interfering with him and I -- he wasn't --

 1  no direct order was given.

 2  Q.   So as I understand it, the first misbehavior report that

 3  you were issued by Mr. LaBarge was dismissed and you weren't

 4  punished for anything?

 5  A.   No.

 6  Q.   What happened with the second misbehavior report that you

 7  received from Mr. LaBarge in 2012?

 8  A.   It was the same thing, interfering.  And he said that I

 9  blocked the window during chow with untidiness or something like

10  that, whatever the charge is.

11  Q.   Untidiness?

12  A.   Yes.  And the same process went on.  It went in front of

13  the lieutenant, the lieutenant looked at the video.  That has

14  been dismissed.

15  Q.   So you weren't disciplined for the second charge that was

16  brought by Mr. LaBarge, either; is that correct?

17  A.   Yes.

18  Q.   What was the third misbehavior report that Mr. LaBarge

19  reported you for?

20  A.   Direct order and lying.

21  Q.   Direct order and lying?

22  A.   Yes.

23  Q.   Can you describe for the jury what that involved?

24  A.   He had gave me a direct order to close my rec pen.

25  Q.   To close what?

 1   A.   The rec pen where you go out to rec at, which is in the

 2   back.

 3   Q.   Did you say rec pen, P-E-N?

 4   A.   Yes.

 5   Q.   Okay.

 6   A.   Told him what time -- I asked him what time was it.  He

 7   told me.  I had let him know that rec wasn't over.  He told me

 8   I'm lying, gave me a direct order to lock in.  I closed the rec

 9   pen.  He telling me the rec pen is not closed according to the

10   counsel officer and therefore he wrote the ticket, said that I

11   was lying, saying that the rec pen was open and it wasn't.

12        And I went the same process, the lieutenant -- from -- the

13   lieutenant, he found me guilty for direct order, not lying.  I

14   appealed it.  It got to the superintendent.  It got dismissed

15   from Article 78.  I had to go through the courts for Article 78

16   procedure and it got dismissed.

17   Q.   Now, how did you know how to do an Article 78 procedure,

18   Mr. McMaster?

19   A.   Because I had read it inside of a jailhouse lawyers manual.

20   Q.   During your time that you've spent in prison, have you

21   spent time litigating cases?

22   A.   Yes.

23   Q.   And, in fact, this particular lawsuit you brought yourself,

24   didn't you?

25   A.   Yes.

1  Q.  And you were representing yourself --

2  A.  Pro sé.

3  Q.  -- up until recently?

4  A.  Yes.

5  Q.  Now, was the third misbehavior report by Mr. LaBarge before

6  or after he asked to see your private parts?

7  A.  Right before.

8  Q.  Had it been dismissed before he asked to see your private

9  parts?

10  A.  No.

11  Q.  So it was pending then?

12  A.  Yes.

13  Q.  So you had a misbehavior report pending, then he came to

14  you the day before you left.  Where were you transferred to?

15  A.  To Great Meadow Correctional Facility.

16  Q.  How long did you spend at Great Meadow Correctional

17  Facility?

18  A.  Approximately six, seven months.

19  Q.  During the time that you were at Upstate Correctional

20  Facility, were you in general population or in isolation?

21  A.  Isolation.

22  Q.  Why were you in isolation?

23  A.  From a prior misbehavior report at Great Meadow

24  Correctional.

25  Q.  So can you describe for the jury what isolation is?

1          MR. MATULA:  Objection, your Honor, to the term

2   isolation.

3          THE COURT:  Yeah, sustained.

4   A.  You --

5          THE COURT:  Wait a minute.  Next question.

6   Q.  As I understand it, Mr. McMaster, there's different levels

7   of confinement within the correctional system, is that true?

8   A.  Yes.

9   Q.  And the general population level of confinement is the

10  most -- is the lowest level, correct?

11  A.  Yes.

12  Q.  And then what is the next step up from that?

13  A.  You go to general population.  From general population, you

14  go to solitary confinement, the SHU.

15          MR. MATULA:  Objection to the term --

16          THE COURT:  What?

17          MR. MATULA:  Judge, does he have the foundation to --

18  I mean, is there the foundation for him to testify about the

19  levels of --

20          THE COURT:  I think he does have the foundation since

21  the amount of time he's been in prison.  I would think he would

22  know this.  Go ahead.

23          MS. BOSMAN:  I'll lay more foundation, your Honor.

24  Q.  Okay.  Can you tell us, please, Mr. McMaster, what is

25  Special Housing Unit and what is solitary confinement?

1   A.   Special Housing Unit is where they put you before solitary

2   confinement.  You either be double celled or single celled.

3   Q.   What's double cell mean?

4   A.   You have a bunkie, cellmate.

5   Q.   So you're in there with one other person?

6   A.   Yes.

7   Q.   And then you have a single cell isolation?

8   A.   Yes, you in there by yourself.

9   Q.   And when you were at Great Meadow Correctional Facility,

10  did you have a roommate, a bunkie?

11  A.   No, I did not.

12  Q.   So you were in there by yourself?

13  A.   Yes.

14  Q.   And how long during the day do you spend in isolation?

15  A.   In Great Meadow, you go in and out.  You -- it's

16  population, so you go to chow, come back, go to rec, come back,

17  go to program, come back.  I got --

18  Q.   I'm sorry, go ahead.

19  A.   At Upstate Correctional Facility, which is the SHU, that's

20  what -- they have you isolated.  You in your cell 24 hours.  The

21  only time you come out is to go out to a call out such as

22  medical or X-rays, a medical trip, like that.  Your rec pen is

23  directly in the back, which they let you out for an hour.

24  That's it.  But you're still in your cell.  You go out to the

25  back for 55 minutes, then they click your gate, tell you to lock

1  back in.  That's it.

2  Q.  When you say rec pen, are you -- is that short for

3  recreational pen?  Rec pen is recreational?

4  A.  Yes, you could say that.

5  Q.  Okay.  How big is the recreational area that you're allowed

6  into one hour a day at Upstate?

7  A.  I have no idea, but if I had to use something to compare it

8  to, I would say about the size of the jury box --

9  Q.  Okay.  And --

10  A.  -- minus two seats.

11  Q.  Minus two seats?

12  A.  Front and back.

13  Q.  Okay.  So at that time when you had those interactions with

14  Mr. LaBarge in 2012, there were no witnesses?

15  A.  Just the neighbors.

16  Q.  Just your neighbors?

17  A.  Yes.

18  Q.  And can you hear your neighbors?

19  A.  Yes.

20  Q.  And can you see your neighbors?

21  A.  No.

22  Q.  Okay.  So you were there by yourself and no one, to your

23  knowledge, saw Mr. LaBarge do the spitting into your juice or

24  ask you to see your private parts, correct?

25  A.  No, besides that camera that's against the wall.

1  Q.   Okay.  Now, after you were transferred to Great Meadow, I

2  think it was --

3  A.   Yes.

4  Q.   -- how long did you spend there?

5  A.   I was in Great Meadows for approximately six to

6  seven months.

7  Q.   And then you were transferred again, correct?

8  A.   Yes.

9  Q.   And do you know -- do you remember where you were

10  transferred after that?

11  A.   No, I do not.

12  Q.   And eventually you were transferred, I believe, to Attica

13  before you went back to Upstate?

14  A.   Yes, I was in Attica then South Port.  South Port sent me

15  to Upstate.

16  Q.   So Attica, South Port, and then back to Upstate?

17  A.   Yes.

18  Q.   And when did you go back to Upstate Correctional Facility?

19  A.   I got there approximately November 14, 2014.

20  Q.   And when you arrived at Upstate Correctional Facility on

21  November 14th of 2015 --

22  A.   '14.

23  Q.   -- 2014 -- see, I get those dates -- I'm sorry.  Thank you.

24     When you arrived there, were you still in the Special

25  Housing Unit?

 1   A.   Yes.

 2   Q.   Were you still in isolation?

 3   A.   Yes.

 4   Q.   Twenty-three hours a day?

 5   A.   Yes.

 6   Q.   Can you tell the jury what you remember about the first day

 7   that you arrived at Upstate Correctional Facility in 2015?

 8   A.   2014.

 9   Q.   2014.  November 14, 2014.  11/14/14.

10   A.   When I first got there, go through the intake process.

11   They do a routine where you've got to side step, face the bars.

12   They pat frisk you, sit you in the BOSS chair, take your

13   self-carry medication if you got any medication, ask you if you

14   need stamps, emergency stamp box.  You could buy 50 stamps to

15   write family and so forth.  If you want somebody to contact your

16   family, emergency contact, which would be the counselor, they

17   did that.  And then they give you a bag, tell you what cell

18   you're going to, what building you're going to, and then they

19   wait for an officer to come.  You put your property on the cart

20   and they wheeled my property down to nine building.  That's

21   where I went.

22        I got to nine building, I seen the medical staff, nurse.

23   She asked me about any medication.  I explained to her, yes, I'm

24   lactose intolerant.  I take Lactaid pills.  I'm diabetic, too.

25   I get Metformin, 850 milligrams.  I'm diabetic, too.  And I have

1    Tylenol for my migraines.  That was it.

2         She told me she would do it.  After she did it, she'll

3    bring it to me in the morning.  And that was it.  I went in my

4    cell.  That was the end of that day.

5    Q.    You said Metformin?

6    A.    Yes.

7    Q.    What is Metformin?

8    A.    Metformin is a medication for diabetes.  Instead of taking

9    insulin, you get Metformin medication.

10   Q.    Is that a medication that you have to take in any

11   relationship to when you eat?

12   A.    You've got to take it before and during, yes.

13   Q.    So you were prescribed Metformin when?

14   A.    I've been prescribed Metformin for -- for that, 2014.  I

15   had it going on four years already.

16   Q.    Okay.  So at some point you were diagnosed with diabetes?

17   A.    Yes.

18   Q.    And you were prescribed a medication and you received that

19   medication with every meal?

20   A.    Yes, I take it with two meals, my breakfast meal and I take

21   it at dinnertime with my dinner meal.

22   Q.    And what happens if you don't take the medication with your

23   meals or you don't get the diabetic medication?

24   A.    My blood sugar will go too high, then it would just have

25   my -- it would trigger my diabetes.

1  Q.   Did you have any other health conditions when you went back

2  to Upstate Correctional Facility in 2014?

3  A.   No.

4  Q.   Did you have any medical -- any other medical conditions at

5  any time during your stay in the correctional facilities?

6  A.   Yes.

7  Q.   Can you describe for the jury what those were?

8  A.   My health conditions was that I was diabetic, lactose

9  intolerant, and I had migraines.  That was my medical issues.

10 Q.   Okay.  Did you have any injuries or scars on your body in

11 2015?

12 A.   '15 or '14?

13 Q.   '14.

14 A.   No, not until after this incident.

15         MS. BOSMAN:  May I approach the witness, your Honor?

16         THE COURT:  You may.

17 Q.   Mr. McMaster, I'm handing you a document that's been marked

18 as Exhibit P-1 -- Plaintiff's 1.

19         THE COURT:  What's the number?

20         MS. BOSMAN:  P-1.

21 Q.   Have you seen that document before, Mr. McMaster?

22 A.   Yes.

23 Q.   And it has your name on it, correct?

24 A.   Yes.

25 Q.   And then it has several pages?

1  A.  Yes.

2  Q.  On the third to the last page, it says DISP.  Do you see

3  that page?

4  A.  Yes.

5  Q.  And then the fourth page in --

6          THE COURT:  Well, let's see, is this going to be

7  offered into evidence before he testifies to the details?

8          MS. BOSMAN:  Oh, yes, your Honor, we offer

9  Exhibit P-1.

10          THE COURT:  Any objection?

11          MR. MATULA:  Judge, I don't have objection to the

12  introduction other than there's certain content that I would

13  like redacted prior to the admission.  I have no issue if the

14  Court wants to proceed now and deal with the redactions later.

15          THE COURT:  Okay.  So noted.  P-1 is received with

16  the note and we'll check the details before it's submitted to

17  the jury.

18          (Whereupon, Plaintiff's Exhibit 1 was marked for

19  identification.)

20  Q.  Okay.  Take a look at page four of that exhibit, Mr.

21  McMaster.  Does that describe the grievances that you filed in

22  2012?

23  A.  Yes.

24  Q.  And does that include the grievance that you filed against

25  Mr. LaBarge regarding spitting in your juice and wanting to see

 1   your privates?

 2   A.   Yes.

 3   Q.   If you take a look at the following page where it says

 4   DISP, does that indicate the disposition or the decisions that

 5   were made upon the grievances that you had filed?

 6   A.   Yes.  I never had received the dispositions or the

 7   decisions until after they did the discovery and I got this

 8   paper.

 9   Q.   And when you refer to the discovery, can you identify or

10   describe to the jury what you mean by discovery?

11   A.   When I filed my 1983 complaint pro sé, it's a process.

12   You've got to go through discovery where you request certain

13   documentations from the Assistant Attorney General and them to

14   see what they have in evidence and let them know everything I

15   have.  And you go back and forth.  If we agree, disagree -- and

16   if you got something that I don't got and vice versa, we must

17   give each other what we requested.

18   Q.   Did you receive other sanctions for misbehavior reports

19   other than solitary confinement or SHU confinement?

20   A.   Yes.

21   Q.   And were some of those other penalties including denial of

22   commissary, for example?

23   A.   Yes.

24   Q.   Can you describe for the jury what other sanctions you

25   received as a result of misbehavior reports over the years?

1    A.   You got keep lock, which means you in population, but you

2    locked in your cell for 15, 20 days.  You get to come out, get

3    commissary, sometimes you don't.

4         You got loss of commissary.  They could take it 30 days,

5    60 days, which means you can't buy no commissary food, a Hot

6    Pocket, like, stamps to write your family, like that.

7         You got loss of phone where you can't get on the phone

8    being that you -- they restrict your phone privileges.  They

9    will not let you get on the phone, period.  You dial a number,

10   it won't go through.

11        And you got loss of recreation, which means you got keep

12   lock.  You could come out your cell to go to chow, you could go

13   to commissary, you could go to the chaplain, you could go to

14   religious services, but you just can't go to recreation with

15   general population.

16   Q.   And as I understand your complaints that we're here about

17   today, you're not suing anybody for loss of those privileges,

18   are you?

19   A.   No.

20             MS. BOSMAN:  May I approach the witness?

21             THE COURT:  You may.

22   Q.   One of the other things that happens in the prison system,

23   Mr. McMaster, is when you're moved from one correctional

24   facility to another, your property is supposed to come along

25   with you, correct?

1    A.    Yes.

2    Q.    And what is contained in your property that's supposed to

3    come along with you?

4    A.    Such as your family photos, your legal work, paperwork,

5    your clothes, if you got an instrument such as a keyboard,

6    guitar, and things of that nature, your sneakers, your boots,

7    socks, like that.

8    Q.    And when you were moved from the correctional facility at

9    Upstate in 2012, was your property sent along with you?

10   A.    Yes.

11   Q.    And when you were moved back to Upstate Correctional

12   Facility in 2015, did you --

13            THE COURT:   '14.

14   Q.    -- '14 -- I've got it in my head --

15            MS. BOSMAN:   I'm sorry, your Honor, I'll write it

16   down.

17   Q.    -- were you -- did your property go with you at that time?

18   A.    Yes.

19   Q.    How long after you got there at Upstate Correctional

20   Facility did you have another contact with Mr. LaBarge?

21   A.    Not even 24 hours; the next morning.

22   Q.    What was the date?

23   A.    November 15, 2014.

24   Q.    And how is it that you came into contact with Mr. LaBarge

25   on that date?

1  A.   He came to my cell, whispered -- talking about he would get

2  me -- told me he would get me.

3  Q.   I'm sorry, I had a hard time understanding you.  Could you

4  pull the microphone a little closer and speak very slowly and

5  clearly for me?  Thank you.

6  A.   Yeah.  He had came to my cell early that morning after I

7  was complaining to see the nurse for my Lactaid medication and

8  my Metformin and he told me now he going to get me.  He told me

9  he going to get me.

10  Q.   So he said, now I'm going to get you?

11  A.   Yes.

12  Q.   I'm going to get you?

13  A.   Yes.

14  Q.   What did you say?

15  A.   I told him I don't know what he talking about and I need to

16  see medical.

17  Q.   And you need to see medical?

18  A.   Yes.

19  Q.   Now, you have a right, it's your understanding, at the

20  prison to request to see medical staff at any time?

21  A.   Yes, if it's an issue -- medical issue, yes.

22  Q.   And what was the medical issue that you had at that time?

23  A.   I did not get my medication for me to eat chow.

24  Q.   Are you talking about the Metformin?

25  A.   The Metformin and my Lactaid pills.

1   Q.   During the discovery phase of this case, did you request

2   videotapes of -- that were taken during the time that you were

3   at Upstate?

4   A.   Yes, I have.

5   Q.   And did you receive two videotapes?

6   A.   No, I only received three different ones other than the

7   ones I requested.

8   Q.   Okay.

9            MS. BOSMAN:  So, your Honor, I believe that the

10  defense has labelled the DVD that contains the videotapes that

11  I'm about to show for the jury as Exhibit D-7.  So, your Honor,

12  we'd offer --

13           THE COURT:  What's the number?

14           MS. BOSMAN:  -- Exhibit D-7.  And there's a

15  stipulation between the parties that those -- that that go into

16  evidence.

17           MR. MATULA:  Your Honor, D-7 is just the escort

18  video, which contains two parts.  We'd be happy to stipulate

19  that into evidence.  If Ms. Bosman wants anything else into

20  evidence, it's got to be identified as a separate exhibit.

21           THE COURT:  D-7 is received.

22           (Whereupon, Defendants' Exhibit 7 was received in

23  evidence.)

24           MS. BOSMAN:  Okay.  Your Honor, we'd also offer the

25  cellblock video that was taken early that morning on the same

1   date, on November 15, 2014.

2           THE COURT:  What number is that?

3           MS. BOSMAN:  That has not been marked.  You didn't

4   mark that one?

5           MR. MATULA:  No, it wasn't our intention to do that.

6           MS. BOSMAN:  It wasn't marked.  Apparently I thought

7   they had both videos on the same DVD.  They don't.  So we would

8   offer that as a separate exhibit because chronologically it

9   comes first, your Honor.

10          MR. MATULA:  Your Honor, I just want to be very

11  particular because there's multiple DVDs that we've handed over

12  to the plaintiff, so just be specific with regard to the time or

13  the specific video footage that we're looking at for purposes of

14  the record.

15          THE COURT:  This -- what did you mark it as?  The

16  last exhibit you have here is P-34.  Is this P-35?

17          MS. BOSMAN:  That's correct, your Honor.

18          THE COURT:  All right.  Then P-35 is received.

19          (Whereupon, Plaintiff's Exhibit 35 was received in

20  evidence.)

21          THE COURT:  And you may play it if you wish.  This is

22  a video on November 15, 2014, in the morning; is that right?

23          MS. BOSMAN:  That's correct, your Honor.  And I'd

24  also request that the jury be offered headphones so they can

25  hear any speech on the videos.

1          THE COURT:  Okay.  Phil?

2          MS. BOSMAN:  Phil, I don't have any picture on my

3     screen here.

4          THE COURTROOM DEPUTY:  Is that on?  There you go.

5     You should have it there.  Is that monitor turned on?

6          MS. BOSMAN:  Nope.

7          THE COURT:  Play the video, please.

8          MS. BOSMAN:  It says HDMI no signal.  Oh, it's up

9     here.  I'll look over here.

10          (Video played.)

11     Q.  Mr. McMaster, I paused the video at that point in time.

12     And I'd just like you to describe for the jury what they're

13     looking at.

14     A.  Ya'll looking at the cell doors that we was just talking

15     about.  The hatch on the bottom screen is open with a Styrofoam

16     tray in there which is a loaf.  They keep saying something about

17     a hand, but you could see that it's the Styrofoam tray that's in

18     there.  And you've got officers in the back that was just doing

19     chow feed up, which was lunch.

20     Q.  So this is a lunch meal that's being delivered to you; am I

21     correct?

22     A.  Yes.

23     Q.  Earlier in the day at 7:00 in the morning, were you

24     delivered a breakfast meal?

25     A.  Yes.

1    Q.   And what was in the breakfast meal?

2    A.   It was cereal, milk, and pancakes.

3    Q.   And tell the jury what happened at the breakfast meal that

4    morning at 7:00.

5    A.   That same first officer that gave me -- that asked me if I

6    wanted my chow, told me to hold my tray, he's going to go speak

7    to the nurse, get my medication so I could eat my breakfast.

8         The second officer came to pick up the trays.  I told him

9    that the first officer, which name is King, he was doing -- he

10   told me hold the tray so he could speak to medical about my

11   medication and therefore I didn't eat breakfast yet.

12   Q.   What do you mean hold your tray?

13   A.   Keep it in my cell until I get my medication.

14   Q.   So the tray that we're looking at in the video was not the

15   breakfast tray?

16   A.   No.

17   Q.   You still had that tray in your cell?

18   A.   Yes.

19   Q.   And you did not receive your diabetes medication that

20   morning, correct?

21   A.   Yes.

22   Q.   And even though you requested that the corrections officers

23   speak to medical about your Metformin, they never came back with

24   any medication, correct?

25   A.   Yes.

1  Q.  So this video that we're watching, he opens the Styrofoam

2  tray, closes it again, correct?

3  A.  Yes.

4  Q.  And what was in that tray at lunchtime?

5  A.  A loaf, a piece of bread that looked like a football with

6  cabbage -- dry cabbage.

7  Q.  So that's a special diet that's used as a form of

8  discipline?

9  A.  Yes.

10  Q.  Had you been disciplined and that was one of the penalties

11  you had received?

12  A.  No.

13  Q.  So why were you getting a loaf?

14  A.  Because he tried -- the second officer had said that I

15  still had my breakfast tray in my cell.

16  Q.  And did you explain to him you were waiting for your

17  medication?

18  A.  Yes, I had.

19  Q.  Did you have your hands outside?

20  A.  At that one, no, I did not.

21  Q.  Eventually did you put your hands outside the gate or the

22  hatch?

23  A.  Yes.

24  Q.  And did you refuse to bring them in?

25  A.  Yes.

1   Q.   Why?

2   A.   Because I was requesting to see the sergeant.  They never

3   was going to get the sergeant.  I know eventually that they

4   would have to get the sergeant if they do not close that front

5   hatch.  That's why they stopped as they did and they go around

6   the wall to finish serving chow because the tray was sitting

7   there and I never took the tray.

8   Q.   Okay.  So it was your attempt to get the sergeant so that

9   you could get your medication?

10  A.   Yes.

11  Q.   Then what happened?

12  A.   I never got my medication.  The sergeant eventually came

13  down there.  When he came down there, he wasn't trying to hear

14  the reason why the incident occurred because defendant LaBarge

15  had already spoke to him.

16  Q.   How do you know?

17  A.   Because he said --

18          MR. MATULA:  Objection, speculation.

19          THE COURT:  Overruled.

20  A.   After that, medical wasn't notified.

21  Q.   Wait, wait, wait.  I want to know who told you they talked

22  to LaBarge.

23  A.   The sergeant.

24  Q.   Who?  What was the name of the sergeant?

25  A.   I do not recall.

1          MR. MATULA:  Objection, hearsay.

2          THE COURT:  Overruled.

3   Q.  Okay.  So the sergeant said I have talked to LaBarge?

4   A.  Yep, LaBarge and the officers.

5   Q.  That were serving the trays?

6   A.  Yes.

7   Q.  Did he say anything else?

8          MR. MATULA:  Objection, hearsay.

9          THE COURT:  Overruled.

10  A.  He said that medical supposed to be notified, nobody told

11  medical, they was going to go check about my medication.  He

12  didn't care about why I held the tray, so forth and so on.  He

13  just wanted me to put my hand in, walk away, and take the loaf.

14  Q.  Then what happened?

15  A.  I never pulled my hand in, I asked to speak to medical

16  about my medication, then they called Lieutenant Tatro.

17  Q.  Lieutenant Tatro?

18  A.  Tatro.

19  Q.  Tatro?

20  A.  Yes.

21  Q.  Is he here in the courtroom today?

22  A.  Yes, he is.

23  Q.  Could you identify him, please, for the jury?

24  A.  He's right there, the third defendant.

25          THE COURT:  Okay.  So noted.

1    Q.   So then what happened?

2    A.   He came down there, gave me a direct order to put my hand

3    in.  I told him no.  He asked me why.  I explained to him the

4    same thing about medical, I need my medication, I didn't eat

5    breakfast, and I didn't do no wrongdoing for them to give me

6    that loaf.

7    Q.   When you said, no, you were refusing a direct order?

8    A.   Yes.

9    Q.   You knew you'd get in trouble for that?

10   A.   If I'm correct, I felt that he would be reasonable and

11   understand why I'm telling him no and see if he could get my

12   medication.

13   Q.   Okay.  You had a hand brace or hand braces at the time; am

14   I correct?

15   A.   Yes.

16   Q.   On both hands?

17   A.   Yes.

18   Q.   Why did you have hand braces on?

19   A.   It was for my wrists, the cuffs, the allergic reaction to

20   the cuff.

21   Q.   So the hand braces you were wearing were to protect your

22   skin --

23   A.   Yes.

24   Q.   -- from the handcuffs?

25   A.   Yes.

1  Q.  Because you would have a reaction to them?

2  A.  Yes.

3  Q.  And was that prescribed to you by some medical officer in

4  the state correction system?

5  A.  Yes.

6  Q.  Where did you first have those prescribed?

7  A.  South Port.

8  Q.  And did that order for those braces or -- I guess it's a

9  Velcro cover?

10  A.  Yes.

11  Q.  Did that go with you from facility to facility?

12  A.  Yes, it did.

13  Q.  You don't have to renew them every time you go to a

14  different facility?

15  A.  Some facilities, yes.  Some facilities, no.

16  Q.  If you have to renew it at a new facility, do they take it

17  away from you when you arrive?

18  A.  Yes, they would take photos of it and then give it back.

19  Q.  On the date that this -- the video of the meals happened,

20  did you have braces on both hands or what do you call them?

21  A.  They were basically braces for the protection from the

22  nickel handcuffs.

23  Q.  Because you're allergic to nickel?

24  A.  Yes.

25  Q.  Okay.  So what happened after Lieutenant Tatro came to the

1  cell and gave you a direct order and you said, no, that you

2  wanted medical?

3  A.   He basically told me he was going to go get medical and get

4  my medication, put my hand in, which -- at that time, he walks

5  away after he stated such.  Medical never came and spoke to me

6  until, like, an hour later -- hours later and told me they were

7  going to get my medication.  I took my medication and that was

8  the end of that.  I put my hand in and I asked about the loaf.

9      They told me -- the second officer that you seen in the

10 video had wrote me up, a misbehavior report, for not following

11 his direct order and giving him my feed up tray after the first

12 officer told me and gave me the order saying that I could hold

13 it being that I ain't get my medication.

14 Q.   So then what happened?

15 A.   Later on that day, medical comes down with Officer LaBarge,

16 asked me about my right to do medication again, told me they

17 ain't got no more Metformin, and then walked away from my cell.

18 Q.   You mean they didn't have any at the facility or you

19 weren't getting any more?

20 A.   They said that there wasn't any right then there at that

21 building.

22 Q.   So they didn't have it available to give to you?

23 A.   Yes.

24 Q.   Then what happened?

25 A.   Officer LaBarge told medical that I'm feeling suicidal.

 1  That's when they all had came down there to bring me out my cell

 2  to the infirmary.

 3  Q.   What do you mean?  Officer LaBarge told who you were

 4  feeling suicidal?

 5  A.   Medical.

 6  Q.   How do you know?

 7  A.   Because that's what he had stated out his mouth and that

 8  was the reason why Lieutenant Tatro came back to my cell.

 9  Q.   Okay.  So I missed a step.  Wasn't there a point that they

10  hit your hand?

11           MR. MATULA:  Objection, leading.

12           THE COURT:  Leading, sustained.

13  Q.   Was there an occasion when you were hit with a baton that

14  day?

15  A.   Yes.

16  Q.   Can you describe for the jury when that happened and what

17  happened?

18  A.   When it happened was after the lunch meal with medical.

19  They came down with Lieutenant Tatro, Lieutenant Tatro gave me

20  the direct orders to put my hand in.  I had told him no until I

21  see medical.  He had struck me -- he had -- another officer

22  struck me several times in my right hand with the baton.

23  Q.   Did you have just one hand in the hatch?

24  A.   Yes.

25  Q.   And that was the hand that was struck with the baton?

1   A.   Yes, it was my right hand.

2   Q.   Then what happened?

3   A.   After that, I pulled my hand in.  Tatro told me I would see

4   medical, that's what caused medical to come to my cell.

5   Q.   When you say caused medical to come to your cell, what do

6   you mean?

7   A.   Medical have to come to your cell if you request it or an

8   incident occurred, injuries, so forth.

9   Q.   When you say medical, you mean a nurse or a Physician

10  Assistant?

11  A.   An RN, a Registered Nurse.

12  Q.   An RN.  So an RN came to your cell after they hit your

13  hand?

14  A.   Yes.

15  Q.   And then what did the nurse say to you?

16  A.   She asked me what was my injuries.  I explained to her my

17  injuries and I told her I need my medication.

18  Q.   What injuries did you have?

19  A.   I had a swollen right hand, my knuckle -- I don't know if

20  ya'll can see, but it's no longer there.  It's been pushed back

21  and I've been requesting to get X-rays taken.  She told me she'd

22  go and check into it.  And I asked about her about my regular

23  medication, which was the Metformin and the Lactaid medication.

24  Q.   And that's because you're lactose intolerant?

25  A.   Yes.

1  Q.  So did -- I don't understand, was LaBarge there when the

2  nurse came?

3  A.  Yes.

4  Q.  Well, what was he doing there?

5  A.  Standing on the wall whispering and doing his whistling.

6  Q.  Whispering to whom?

7  A.  To me.

8  Q.  Whispering what?

9  A.  That he going to get his chance to get me, as he told me

10  before.

11  Q.  And then the nurse came?

12  A.  Yes, I had spoke to her about the medication.

13  Q.  And that she told you they didn't have any in the building

14  at that time?

15  A.  The Metformin.  She had left, got the Lactaid, told me I'm

16  not getting the Metformin, there's none in nine building.

17  Officer LaBarge went and told her that I'm requesting -- that

18  I'm feeling suicidal.

19  Q.  When you say that Officer LaBarge told the nurse that you

20  were feeling suicidal, did you hear him tell her that?

21  A.  Yes.

22  Q.  Do you remember the name of the nurse?

23  A.  I believe it's Elizabeth White, E. White.

24  Q.  Did you tell Officer LaBarge or any other person that

25  afternoon that you were feeling suicidal?

1  A.   No, I did not.  I never had any dealings with OMH before

2  that day.

3  Q.   So you'd never been placed in an observation cell or

4  suicide watch cell prior to that date?

5  A.   None.

6  Q.   Okay.  Then what happened after that?

7  A.   Lieutenant Tatro came, told me I must come out to go to the

8  infirmary.  I said for -- I asked him why.  He told me that

9  medical going to examine me and see what's going on with my

10 injuries.

11 Q.   Your hand?

12 A.   Yes.  I had told him I'm not coming out my cell, medical

13 could come to my cell as indicated prior.  He told me that

14 medical is not coming to my cell, so therefore I have to come

15 out one way or another.

16 Q.   Then what happened?

17 A.   The whole -- they got -- as he said earlier, they got an

18 extraction team ready, told me to come out.  If I don't come

19 out, they're going to gas me, come in my cell, force me down to

20 the infirmary, which is the hospital in the facility.  As time

21 went on, you had -- Sergeant Thompson, he comes, speaks to me,

22 and tells me, McMaster, come out, medical going to assist you

23 when you go down to the infirmary, don't worry about it, it's

24 all right.

25      I told him, no, LaBarge told me this is his time to get me,

 1  whatever he meant by that, he making threats.  I took it as if

 2  I'm going down there and something's going to happen.  And

 3  that's exactly what I told Sergeant Thompson who's in this room

 4  today.

 5          MS. BOSMAN:  Your Honor, at this time we ask to be

 6  able to play the -- Exhibit D-7, the DVD of the escort.

 7          THE COURT:  P-7?

 8          MS. BOSMAN:  D as in defendants.  This is the DVD

 9  that they produced today.

10          THE COURT:  Okay.  The escort video?

11          MS. BOSMAN:  Correct.

12          THE COURT:  Okay.  Go ahead.

13          MR. MATULA:  Yep, click on that one and go under TS,

14  then go all the way down to the bottom -- one up from the

15  bottom.  Yep, right there.

16          THE COURT:  This is the video.

17          (Video played.)

18  Q.  Mr. McMaster, what did you just say there?

19  A.  I had told them that -- Lieutenant Tatro that Officer

20  LaBarge had wrote several falsified misbehavior reports on me

21  and like he just told me, now is his time to get me for

22  retaliation for my grievances, which I was talking about.

23  Q.  So you alerted Lieutenant Tatro that Officer LaBarge had

24  threatened you?

25  A.  Yes.

1   Q.   And was Officer LaBarge -- can you see him on the video?

2   A.   No, he's nowhere on the video.  He's the one holding the

3   video.

4   Q.   So Mr. LaBarge is carrying a video camera and following

5   you?

6   A.   Yes.

7   Q.   Continue.

8            (Video played.)

9   Q.   Mr. McMaster, did you just hear someone whistle?

10  A.   Yes.

11  Q.   Who was whistling?

12  A.   LaBarge.

13  Q.   Continue.

14           (Video played.)

15  Q.   Mr. McMaster, are the black things on your hands the braces

16  or the protective cover that we talked about earlier?

17  A.   Yes.

18  Q.   Were they taken away from you at any time prior to this

19  date at Upstate Correctional Facility?

20  A.   I had -- no, I had it.

21  Q.   Okay.

22           (Video played.)

23  Q.   What did you just say there in the tape, Mr. McMaster?

24  A.   I asked them not to touch my locks.

25  Q.   Who touched your locks?

1  A.   The Officer Locke.  That's the officer that's on the side.

2  Q.   Continue.

3           (Video played.)

4  Q.   Mr. McMaster, do you know where you are in the facility as

5  you're walking in this direction right now?

6  A.   That's the infirmary.

7  Q.   You're in the infirmary at this point?

8  A.   Yes.

9  Q.   Continue.

10          (Video played.)

11  Q.   Mr. McMaster, what did you say just at that moment?

12  A.   I asked them where was the cameras at.  He said the

13  camera's right here.  And I told him there's no cameras inside

14  that room because Sergeant Thompson -- Tompkins had told me that

15  if I go down to medical, there's cameras down there, they not

16  going to do nothing, don't worry about it, and I'll be seen by

17  medical staff.

18  Q.   So when you said there's no cameras in that room, what room

19  are you referring to?

20  A.   The room that's open that they trying to put me in,

21  which -- they call it the OMH room.

22  Q.   They call it the OMH room?

23  A.   Yes.

24  Q.   Continue.

25          (Video played.)

1    Q.   Mr. McMaster, who just said, McMaster follow directions?

2    A.   That was Lieutenant Tatro.

3    Q.   Continue.

4              (Video played.)

5    Q.   What are you saying there, Mr. McMaster?

6    A.   That my wedding ring do not come off my finger.

7    Q.   So he asked you for your glasses?

8    A.   Yes.

9    Q.   And your wedding ring?

10   A.   Yes.

11   Q.   Why did you tell him your wedding ring does not come off

12   your finger?

13   A.   Because it's stuck.

14   Q.   Any other reason?

15   A.   Yes, I -- there wasn't no reason for it to come off.  I

16   never heard of an inmate in them rooms -- and I've seen several

17   other inmates with their wedding rings on.

18   Q.   Does your wedding ring have any significance to you?

19   A.   Yes.

20             MR. MATULA:  Objection, leading.

21             THE COURT:   Sustained.

22   Q.   How long have you had your wedding ring?

23   A.   For ten years prior to this.

24   Q.   Continue.

25             (Video played.)

 1   Q.   Did you just say you're not supposed to be on special

 2   watch?

 3   A.   Yes.

 4   Q.   Why?

 5   A.   Because I was told by the same lieutenant that I was only

 6   coming down there to see medical about my hand from being hit

 7   with the baton earlier that day.

 8   Q.   And when you say the lieutenant, what lieutenant are you

 9   referring to?

10   A.   Lieutenant Tatro.

11   Q.   Continue.

12          (Video played.)

13   Q.   What did you just say on the tape, Mr. McMaster?

14   A.   I told him I wasn't supposed to be on OMH watch, they want

15   me to be on OMH watch, I'm compliant, so please let me keep my

16   wedding ring and I don't care about nothing else.

17   Q.   Continue.

18          (Video played.)

19   Q.   What did you just say to Lieutenant Tatro, Mr. McMaster?

20   A.   That my wedding ring have not been off my finger since I've

21   been married.

22   Q.   Continue.

23          (Video played.)

24   Q.   What did you just say to Lieutenant Tatro and what did he

25   say to you?

 1   A.   I asked him if he could show me this in writing, which

 2   every facility you be in they have a memorandum or a directive,

 3   rules and regulations that they go by.  And he told me, yes,

 4   there's a memorandum, he'll show me.  And --

 5   Q.   Continue.

 6            (Video played.)

 7   Q.   Mr. McMaster, what did you just say?

 8   A.   I said I'm compliant with them and they always making stuff

 9   up.

10   Q.   Can you identify who's appearing in the video when you say

11   that?

12   A.   You have Sergeant Thompson, Blue, and CO Locke.

13   Q.   Sergeant Tompkins?

14   A.   Tompkins, the defendant.

15   Q.   Okay.  Can you describe where he is in the picture as

16   you're looking at it right now?

17   A.   He's to my left with the white shirt on.

18   Q.   Touching his elbow?

19   A.   Yes.

20            MS. BOSMAN:  Your Honor, I ask that the defendant be

21   identified.

22   Q.   Can you describe where he's located?

23   A.   Right there.

24   Q.   Standing up.

25            Okay.  Continue?

1             (Video played.)

2    Q.   Who just whistled?

3    A.   Correction Officer LaBarge.

4    Q.   Continue.

5             (Video played.)

6    Q.   What was just said on the video?

7    A.   That the watch commander going to call the civilian psych

8    guy to see if I could keep my wedding ring.

9    Q.   What do you understand -- a civilian psych doctor?

10   A.   Yeah, the unit chief.  As I know, the unit chief.

11            (Video played.)

12   Q.   Who just whistled?

13   A.   LaBarge.

14   Q.   And did you say something in response?

15   A.   Yes.

16   Q.   What did you say?

17   A.   I said, stop whistling.

18   Q.   Continue.

19            (Video played.)

20   Q.   Now, did you say whispering or whistling?

21   A.   Whispering.

22   Q.   Oh, okay.  And you said what else?

23   A.   I know what he's saying.

24   Q.   So did you hear Mr. LaBarge whispering while he's holding

25   the video camera?

1   A.   Yes, before he whistled, what you heard -- he was saying

2   something to K. Ellsworth.

3   Q.   Can you tell the jury what he said?

4             MR. MATULA:  Objection, foundation, your Honor.

5             THE COURT:  Overruled.  You may answer.

6   A.   That we'll finish him, that's what he said.

7   Q.   So I understand, did you hear him whisper that?

8   A.   Yes, and then he did his whistle.

9   Q.   Continue.

10            (Video played.)

11  Q.   Who just whistled?

12  A.   L.W. LaBarge, the defendant.

13  Q.   Mr. LaBarge?

14  A.   Yes.

15  Q.   Please continue.

16            (Video played.)

17  Q.   Mr. McMaster, for the record, it appears that you have your

18  hands up on the wall and you have your head against the wall

19  between your hands, is that fair to say?

20  A.   Yes.

21  Q.   And can you tell the jury what you're doing?

22  A.   Crying and praying.

23            (Video played.)

24  Q.   Can you hear what was just said while you were there?

25  A.   Yes, he said, it's hot, I think we should open up the

1  window.

2  Q.  What time of year was it?

3  A.  It was wintertime.  Snow was on the floor.  It was

4  freezing.

5          (Video played.)

6  Q.  Who was just laughing?

7  A.  That was --

8          MR. MATULA:  Objection, foundation.

9          THE COURT:  Overruled.

10  A.  That was the Officer LaBarge and the other officer that was

11  outside the room.

12  Q.  So is the door open at this point?

13  A.  Yes.

14          MR. MATULA:  Objection, foundation.

15          THE COURT:  Overruled.

16  Q.  And there was an officer standing outside the room?

17  A.  There was a couple of officers outside the room.

18  Q.  Can you identify -- who are the officers in the picture

19  right now?

20  A.  That's Officer Bilow.

21  Q.  Bilow?

22  A.  Yeah, Bilow, B-I-L-O-W.

23  Q.  Okay.  Continue.

24          (Video played.)

25  Q.  What did you just say?

1   A.   Where's the lieutenant.  I was requesting where the

2   lieutenant was at.

3   Q.   Continue.

4            (Video played.)

5   Q.   Who just whistled?

6            MR. MATULA:  Objection, foundation.

7            THE COURT:  Overruled.

8   A.   Officer LaBarge.

9   Q.   Continue.

10           (Video played.)

11  Q.   Did you understand what was being said at that point?

12  A.   He said something about burgers and something else.

13  Q.   Continue.

14           (Video played.)

15  Q.   What did Lieutenant Tatro just say to you?

16  A.   That the lieutenant -- psychiatrist said that I can keep my

17  ring.

18  Q.   The civilian psychiatrist?

19  A.   Yes.

20           (Video played.)

21  Q.   What did you just say to the officer?

22  A.   I asked Lieutenant Tatro if he could tell Officer Locke,

23  the one that's on my back, if he could back up and move over a

24  little bit.

25  Q.   Was his body touching your body?

1   A.   Yes.

2             (Video played.)

3   Q.   What did you just say there, Mr. McMaster?

4   A.   I had told him that he the same lieutenant that had

5   explained to me that medical had nothing to do with security.

6   Q.   Okay.

7             (Video played.)

8             MS. BOSMAN:  That's not the end of the video.  Your

9   Honor, I don't know what went wrong, but that's not the end of

10  the video.

11            MR. MATULA:  It's just a second file.

12            (Video played.)

13            MS. BOSMAN:  Your Honor, I'd request a brief --

14            THE COURT:  Is that the end of the video?

15            MS. BOSMAN:  That's the end of the video.

16            THE COURT:  All right.  We'll take a break, members

17  of the jury.  So go to the jury room and we'll take a 10,

18  15-minute break and we'll be back.  Don't discuss the case with

19  yourselves or among anyone else.

20            THE COURTROOM DEPUTY:  Court stands for a short

21  recess.

22            (Jury Excused.  Time noted:  2:51 p.m.)

23            THE COURT:  Okay.

24            THE COURTROOM DEPUTY:  Ten, fifteen minutes.

25            (Court in recess.  Time noted:  2:52 p.m. to

1   3:11 p.m.)

2            THE COURT:  Bring in the jury.

3            MS. BOSMAN:  Your Honor --

4            THE COURT:  No, we're going to bring in the jury.

5            MS. BOSMAN:  I was going to bring my client up to the

6   stand, your Honor.

7            THE COURT:  Well, get him up on the stand.

8            (Jury present.  Time noted:  3:12 p.m.)

9            THE COURTROOM DEPUTY:  Please be seated.

10           THE COURT:  Ms. Bosman, you may continue your direct

11  examination of the plaintiff.

12           MS. BOSMAN:  Thank you, your Honor.  Your Honor, at

13  this time we continue with Exhibit P-35 where we left off.

14           (Video played.)

15  Q.  Mr. McMaster, who's standing directly in front of your cell

16  right at this time?

17  A.  Sergeant Thompson.

18  Q.  Thompson or Tompkins?

19  A.  Tompkins.

20  Q.  And could you identify him for the jury?

21  A.  He's right there, the fourth defendant.

22  Q.  Tompkins.

23      Okay.  And is it -- there's another guard standing next to

24  your cell in this photograph?

25  A.  Yes.

1   Q.   And who is that?

2   A.   CO King.

3   Q.   Have you seen this video before?

4   A.   After summary judgement, yes.

5   Q.   Okay.  And on this video is -- the conversation that you

6   had with Lieutenant Tatro that he asked you to go to the

7   infirmary, is that conversation on here?

8   A.   Yes, it's after CO King and him go -- and Sergeant Rowe and

9   Tompkins is at the -- in front of my cell.

10           (Video played.)

11   Q.   Did you just say something to the -- Officer King?

12   A.   I was talking to the sergeant --

13   Q.   What did you say?

14   A.   -- about medical.

15       That I had told King that I need to speak to him about my

16   medication, he walked away, I never held no tray.  And just now

17   I stated to him that I'm a diabetic, I can't eat that.

18           (Video played.)

19   Q.   Who is that approaching your cell?

20   A.   CO Mattie or something like that.

21   Q.   Who is the other officer that's standing there?

22   A.   The one waving, that's -- I think that's King.  That's the

23   one who came and picked up the trays.

24   Q.   Who's leaning against the wall?

25   A.   CO King.

1    Q.   What did you say just then, Mr. McMaster?

2    A.   Just now?  I was telling them about the diabetic, my

3    medication, and I ain't never hold no tray.

4    Q.   Anything else?

5    A.   No, I didn't hear it.

6              (Video played.)

7    Q.   Mr. McMaster, do you have an understanding of what's

8    happening right now where the screen says 11 minutes 10 seconds

9    37 seconds?

10   A.   No, I just know I was told that they're going to try to

11   talk to medical about my medication.

12   Q.   Now, you see where it says building nine up at the top

13   left-hand corner?

14   A.   Yes.

15   Q.   Is that because that's where you're housed?

16   A.   Yes.

17   Q.   Did someone just open your cell?

18   A.   Yep.

19   Q.   Who was that?

20   A.   The counsel officer because Sergeant Tompkins told them to

21   open my cell.

22             (Video played.)

23             THE COURT:  Ms. Bosman, is there something in here?

24   We're just sitting here wasting time.

25             MS. BOSMAN:  Yes, your Honor.  I'm getting to that,

 1  but I would like to ask -- could I ask Mr. McMaster a question?

 2  Q.  Mr. McMaster, on this date how many days have you been in

 3  isolation before this happened?

 4  A.  I was -- I'd say no more than 20 days.

 5          MS. BOSMAN:  I'll try to skip ahead, your Honor.

 6  Q.  Can you identify who's standing in front of your cell at

 7  this time?

 8  A.  You've got Lieutenant Tatro with his hand on the wall.

 9  You've got Sergeant Rowe with his arms crossed in front of my

10  cell.  CO King next to him with the blue shirt waving.  And you

11  have Sergeant Tompkins on the other side behind the door.

12          (Video played.)

13  Q.  Okay.  Mr. McMaster, who's in front of your cell at

14  12:04:17?

15  A.  LaBarge, you've got Tatro, Tompkins, and the officer that

16  struck me with the baton.  I don't -- I still don't know his

17  name to this day.

18  Q.  What does LaBarge have in his hand?

19  A.  A handheld camera.

20  Q.  A videocamera?

21  A.  Yes.

22  Q.  Did you make a request for that recording that Mr. LaBarge

23  made on that day?

24  A.  Yes.

25  Q.  Did you ever receive it or see it?

1   A.   Yes.

2   Q.   When?

3   A.   I received it a couple of months ago.  They had put it in

4   my personal property and the law library officer in Sing Sing

5   Correctional Facility just showed it to me before I came to

6   Auburn.

7   Q.   Do you have it with you as you arrived here?

8   A.   No, I do not.  It was alleged to be sent back to them.

9               (Video played.)

10  Q.   What's happening now?

11  A.   The officer's striking my hand with the baton.

12  Q.   What are you saying to Lieutenant Tatro when he did that?

13  A.   I'm telling him to tell him to stop hitting my hand, get

14  medical, and stop hitting my hand.

15              (Video played.)

16  Q.   What was that knocking?

17  A.   That was my neighbor and them knocking on the door telling

18  them to get medical for him.

19              (Video played.)

20              MS. BOSMAN:  May I approach the witness?

21  Q.   Mr. McMaster, I'm handing you what's been previously marked

22  as for identification as Plaintiff's Exhibit 6 and 7.  Could you

23  identify those documents for the jury, please?

24  A.   Yes, the first one is my letter to the dep of

25  administration and dep of security, S. Danforth.  And the second

1  one is refusal for medical at a -- I mean, at a tier hearing --

2  a refusal to go to a disciplinary hearing.

3          MS. BOSMAN:  Your Honor, we offer Exhibits 6 and 7.

4          THE COURT:  Any objection?

5          MR. MATULA:  No objection to Exhibit 7 -- I'm sorry,

6  to 6.

7          THE COURT:  Seven is received.

8          MR. MATULA:  Judge, no objections to 6, but I also do

9  not have any objection to 7, either.

10         THE COURT:  Plaintiff's 6 and 7 are received.

11         (Whereupon, Plaintiff's Exhibits 6 and 7 were

12  received in evidence.)

13         THE COURT:  Proceed.

14  Q.  Mr. McMaster, if you take a look for a minute at Exhibit 7,

15  that is a document that was read into the record on

16  December 10th of 2014, correct?

17  A.  Yes.

18  Q.  And that's a document that was signed by whom or given

19  by --

20  A.  It says A-something.  An employee says A-something, the

21  employee signature.  Then on the bottom you've got the hearing

22  officer, Ms. McIntosh --

23  Q.  Okay.

24  A.  -- the DSP.

25  Q.  And the inmate's name that wrote this or that they're

1   quoting here is blacked out, correct?

2   A.   Yes.

3   Q.   Is this an inmate that you had identified as a witness

4   through your disciplinary hearing that was held on

5   December 10th?

6   A.   Yes, I had requested an inmate witness on my behalf to come

7   to the hearing and that's what -- this is the paper that they

8   supposedly give and read into the record if they refuse.

9   Q.   And that was a misbehavior report for your refusal to take

10  your hands back in your cell?

11  A.   Yes.

12  Q.   So in addition to hitting you with the baton, they also

13  gave you a misbehavior report?

14  A.   Yes.

15  Q.   And did you receive a penalty for that, as well?

16  A.   Yes, I have.

17  Q.   And what was the penalty that you received in addition to

18  being struck on the hand?

19  A.   They gave me more time in SHU and they gave me the loaf for

20  seven extra days, that football loaf of bread.

21             THE COURT:  Move close to the mic and speak up.

22             THE WITNESS:  The football loaf of bread.

23             MS. BOSMAN:  May I approach the witness?

24             THE COURT:  You may.

25  Q.   Handing you now what's been marked for identification as

1  Plaintiff's Exhibit 5.  Could you identify it for the record?

2  A.   It's an 1140 form, which is a strip frisk form for the

3  admission to SHU.

4  Q.   What's the date of that strip frisk form?

5  A.   November 15, 2014.

6  Q.   And is that the same date that we saw the video of where

7  they took you to the infirmary for OMH?

8  A.   Yes.

9          MS. BOSMAN:  We offer the exhibit.

10          THE COURT:  Any objection?

11          MR. MATULA:  No objection, your Honor.

12          THE COURT:  Received.

13          (Whereupon, Plaintiff's Exhibit 5 was received in

14  evidence.)

15          MS. BOSMAN:  May I approach the witness?

16          THE COURT:  Yes.

17  Q.   Handing you what's been marked for identification as

18  Plaintiff's Exhibit 8.  Could you identify that for the record?

19  A.   It's a tier assistance form, a tier selection assistance

20  form, and Tier III case data worksheet.

21  Q.   And what is -- is that the form that you had at the

22  hearing?

23  A.   This is a form that -- this is a form that they give you

24  when they serve you a copy of the misbehavior report.  That's

25  the tier selection, the assistance selection paper.  They give

1    you this with a copy of your misbehavior report for you to sign

2    and pick an officer or a civilian to help you with your

3    misbehavior report for any charges if you don't understand it.

4        And the assistance form is whatever employee or civilian

5    they give you supposed to help you get your witnesses, if they

6    want to testify, yes or no, if they willing to testify on your

7    behalf, any documentations you need, videos, such of that

8    nature, logbook entries.  They supposed to go get it, come back,

9    and then you sign for it if they complete they job.

10   Q.  And does your signature appear on that document?

11   A.  My signature don't appear on either three of these

12   documents.

13   Q.  So why not?  What is the -- how is that document in your

14   hearing file if it's not signed by you?

15           MR. MATULA:  Objection, speculation.

16           THE COURT:  Yeah, sustained.

17   Q.  Did you become aware that they had provided a refusal form

18   signed by another inmate?

19   A.  No, I was not, until going in discovery that we just spoke

20   about earlier.  The only hearing process -- I wasn't aware of

21   none of that.  I know on this assistance sheet, all my

22   witnesses -- any witnesses that I requested to testify on my

23   behalf of any wrongdoing, they all agreed to be present and come

24   testify at my hearing.

25           MS. BOSMAN:  Your Honor, we offer the exhibit.

1          MR. MATULA:  We object, your Honor.

2          THE COURT:  Is that Plaintiff's 8 that you're

3    offering?

4          MS. BOSMAN:  Yes, your Honor.  I'm sorry.

5          THE COURT:  He's objecting, but I'm going to receive

6    it after that last answer.

7          (Whereupon, Plaintiff's Exhibit 8 was received in

8    evidence.)

9          MS. BOSMAN:  Okay.  May I approach the witness, your

10   Honor -- well, may I have a moment, your Honor?  Okay.  May I

11   approach the witness?

12   Q.  Handing you what's been marked as Plaintiff's Exhibit 27.

13   Could you identify that for the record?

14   A.  Yes, this is my grievances at the facility about the

15   November 15th incident.

16   Q.  And the process by which an inmate is allowed to make a

17   grievance is that you fill out a form or you write it out on a

18   piece of paper like that?

19   A.  Yes, after you fill it out on the form or write on a

20   regular piece of paper, it goes to a mailbox through one of the

21   plaintiffs, another correction officer comes, picks up the mail,

22   and it's supposed to be brung up front.

23   Q.  Did you say through one of the plaintiffs?

24   A.  Yes, or any other correction officers.

25   Q.  You mean defendants?

1  A.   Defendants.   Defendants.

2  Q.   You're the plaintiff.

3  A.   Yeah, defendants.   Excuse me.

4  Q.   And is Exhibit 27 a grievance that you filed on

5  November 18th of 2014?

6  A.   Yes, there's one from -- about the November 15, 2014,

7  incident and the November 25, 2014, incident when I met with

8  this PA Kowalchuk.

9            MS. BOSMAN:   Your Honor, we offer Exhibit 27.

10           THE COURT:   Well, as I understand it, this is a

11  grievance with regards to the November 15th matter that is the

12  issue of this lawsuit?

13           MS. BOSMAN:   Correct, your Honor.

14           THE WITNESS:   Yes.

15           THE COURT:   All right.   Received.

16           (Whereupon, Plaintiff's Exhibit 27 was received in

17  evidence.)

18  Q.   Now, Mr. McMaster, on November 15, 2014, we watched the

19  video of you traveling or being escorted between your cell and

20  the infirmary, correct?

21  A.   Yes.

22  Q.   But we didn't see you come out of your cell, correct?

23  A.   Yes.

24  Q.   And so what happened prior to the -- that video starting,

25  how is it that you came out of your cell?

1  A.   The sergeant's, as you seen, in front of the cell just now

2  in the video and a lieutenant came to my cell with medical and

3  told me that I'm going to be examined down there or if not,

4  they're going to force me out.

5  Q.   Examined for what?

6  A.   My hand from them hitting me with the baton.

7  Q.   So is there a protocol that's followed once physical

8  punishment is imposed on you that you have to be examined by

9  medical?

10             MR. MATULA:  Objection, foundation.

11             THE COURT:  Overruled.  Go ahead.

12  A.   It's supposed to be if anything happened, a regular fight,

13  physical harm, whatever, is done to you, medical is supposed to

14  assess you.  After they assess you, take photos if it's

15  necessary.  If you're bleeding, stop the bleeding.  If you need

16  stitches, stitch you up.  And then they go from there, fill out

17  a medical report, injury report, and put it inside your medical

18  folder.

19  Q.   Did you speak with the Physician's Assistant about your

20  Metformin at that time?

21  A.   No, I didn't see the physician until 10 days, 11 days later

22  after the incident.

23  Q.   So medical didn't come to your cell?

24  A.   No, they wasn't a physician, it was an RN, a nurse.

25  Q.   The nurse -- when -- I'm sorry.

1    Did the nurse talk to you about the Metformin after you had

2  been hit with the baton?

3  A.  No, she told me when I go up there, as well as Lieutenant

4  Tatro, Rowe, and Tompkins, when I go to the infirmary and be

5  examined for my hand, they would talk to me about it.  That's

6  when I was told there wasn't none.

7  Q.  When's the first time that you learned that these

8  defendants were taking you to the infirmary because they said

9  that you threatened to harm yourself?

10  A.  Right there at the gate when Lieutenant Tatro gave LaBarge

11  the order to let it be known that I'm going on an OMH special

12  watch.

13  Q.  Was that after you came out of your cell?

14  A.  Yes.

15  Q.  And then Mr. LaBarge started videotaping you walking down

16  the hall, right?

17  A.  Yes.

18  Q.  And then at the end -- the very end, who is it that locked

19  the door?

20  A.  That was defendant Lamare; S.D. Lamare.

21  Q.  Can you identify him for the jury, please?

22  A.  He's right there -- Lamare's not here.

23  Q.  He's not here?

24  A.  No, he's not.

25        MR. MATULA:  No, he's outside of the courtroom per

1   the Court's instruction.

2           THE COURT:  Yeah, defendant Lamare is not -- he's got

3   some medical issues.  He's outside the courtroom.  He's here

4   today, but he's outside the courtroom.

5   Q.  Okay.

6           THE COURT:  He will be in at appropriate times.

7   Q.  Okay.  So what happened after you were locked in the cell,

8   the OMH cell at the infirmary?

9   A.  Within five minutes of the camera going off, the door had

10  opened back up, they had came in there and physically assaulted

11  me.

12  Q.  Who came?

13  A.  Defendants K. Ellsworth, LaBarge, Lamare, and several other

14  officers that at that time I didn't know they name, but now as

15  Bilow and King.

16  Q.  Can you identify Officer Ellsworth, please?

17  A.  K. Ellsworth is the second defendant right there.

18  Q.  And so within five minutes after we saw the door lock and

19  the video was turned off --

20  A.  The door had opened back up and they had came in there,

21  physically assaulted me while I was on the floor.  As ya'll

22  seen, I didn't have no clothes on.  I was getting my hair pulled

23  and I'm being physically assaulted with the baton on my feet and

24  I felt something enter my rectum.  You have defendant LaBarge

25  telling me, how you like that, I told you I'd get you, stop

1   writing complaints, how you feeling, I know you like it.  And

2   that was it, they left.

3       They came back within another 20 minutes, 30 minutes, did

4   the same thing, told me medical coming.  Medical never came and

5   saw me at all.

6       Then in another half hour they just assaulted me, threw ice

7   cold water on me, telling me they run this, they the head

8   leaders no matter what, slavery is back, and I'm going to take

9   it regardless, medical's not going to save you, they could get

10  the cameras but they don't work, it was all a fake.  LaBarge

11  told me he was going to get me and he got me.

12  Q.   When they came back in the first time, who's the first

13  person you saw?

14  A.   Lamare.

15  Q.   And did Lamare say anything?

16  A.   He told me sit down, they're going to get medical for me,

17  and what's wrong.

18  Q.   He said, sit down, he's going to get medical for you?

19  A.   Yes.

20  Q.   Did you sit down?

21  A.   Yes.

22  Q.   Where did you sit down?

23  A.   In the corner as he told me.

24  Q.   So he told you to sit down on the corner on the floor?

25  A.   Yes.

1  Q.  Now, there was some kind of a rug or carpet thing on the

2  floor in the video?

3  A.  It's the mat.

4  Q.  What's the mat?

5  A.  It's the little green square boxes.  They supposed to be

6  like a blanket or a sheet, but it's a square regular mat.

7  Q.  Did you sit down on the mat?

8  A.  Yes.

9  Q.  And then what happened?

10  A.  That's when LaBarge came in the room and rushed me while I

11  was in the corner and assaulted me.

12  Q.  When you say they rushed you, what did they do?

13  A.  They -- one of them came, swung to hit me in my face, I

14  tried to protect myself by curling up.  They grabbed my hair,

15  pinned me on the floor.

16  Q.  Pinned you on the floor where?

17  A.  On my stomach right there on the regular floor, not on the

18  mat.  I was on the concrete floor.  They were pulling my hair

19  and hitting me with -- my feet with the baton sticks.

20  Q.  Hitting your feet with the baton sticks?

21  A.  Yes.

22  Q.  On the bottom of your feet?

23  A.  Yes.

24  Q.  Did they hit you anywhere else?

25  A.  My face and then on my back a couple times.

 1  Q.  Did they hit you on your face when you were face down?

 2  A.  Yes, like on the side of my face.

 3  Q.  Which side of your face?

 4  A.  My left.

 5  Q.  And where else did they hit you?

 6  A.  My back.

 7  Q.  And you said that they put something in your rectum?

 8  A.  Yes.

 9  Q.  Who did that?

10  A.  That was LaBarge stating, how do I like it, how do it feel,

11  and I'm going to take it one way or another.

12  Q.  And then you said that you felt a finger in your rectum?

13  A.  It felt as if it was a finger, yes.

14  Q.  Before or after the baton?

15  A.  Before.

16  Q.  How long did that go on?

17  A.  I'd say about two minutes, which felt like forever.

18  Q.  And then what happened?

19          THE COURT:  Ask him who else, if anyone, was in the

20  room at the time this went on.

21  Q.  Who else, if anyone, was in the room at the time that this

22  went on?

23  A.  You had the defendants, Ellsworth --

24          THE COURT:  No, name people if you recognize them or

25  not, not just the defendants.  Who else was in the room at the

1    time that you saw -- that you saw?

2    A.   K. Ellsworth, S.D. Lamare, Bilow, LaBarge, and that was

3    that I seen.  And then you had Locke, the one that was standing

4    on my back -- standing behind me and I asked Lieutenant Tatro if

5    he could tell him back away from me.

6    Q.   But he's not a defendant here?

7    A.   I never knew his name.  And in my grievance I reported

8    several others.  I've been trying to get his name and he ain't

9    never came -- his name never became mentioned until later on

10   after discovery.

11   Q.   So you said that they came back in how many times?

12   A.   Approximately four to five times.

13   Q.   Between four and five times?

14   A.   Yes.

15   Q.   And each time you were assaulted?

16   A.   Yes.

17   Q.   Did you yell?  Did you scream?

18   A.   Yes.

19   Q.   Where was the nurse?

20   A.   In the nurse station.

21            MR. MATULA:  Objection, foundation.

22            THE COURT:  Sustained, unless he lays a foundation as

23   to the nurse.

24   Q.   Did you see the nurse?

25   A.   I didn't see the nurse until later.

1   Q.   When did you see the nurse later?

2   A.   When they came out the room, like, the fourth time.

3   Q.   After they were leaving?

4   A.   Yes.

5   Q.   Where was the nurse?

6   A.   She was coming down the hallway.  You see in the video,

7   they got the hallway area.  She was coming down asking me what

8   was going on and she pulled them into a little break area room

9   and spoke to them and then they left.

10  Q.   What do you mean she pulled them?  Who's them?

11          MR. MATULA:  Objection, foundation.

12          THE COURT:  Yeah, sustained.

13  Q.   Did you see the nurse engage anyone in particular?

14  A.   Yes.

15  Q.   Who did she speak to?

16  A.   Defendant Lamare, LaBarge, K. Ellsworth, and Bilow.  Locke,

17  I didn't see him go inside the room.

18  Q.   So then they went into the room with the nurse?

19  A.   Yes.

20  Q.   And where were you at the time that you saw that happen?

21  A.   Still inside that OMH room, I seen the defendants Rowe and

22  Tatro and I had explained to them what was going on.  They just

23  laughed and walked away.

24  Q.   What do you mean you explained to them what was going on?

25  A.   I was telling them that I'd just been physically assaulted

1   and that they raped me and they just laughed and walked away.

2   Rowe came back, told me I'm going to be there till morning and

3   you can deal with medical from there.

4   Q.   And I want you to be very clear with the jury, when you say

5   rape, can you tell the jury specifically what you mean by rape?

6   A.   He put something in my rectum without my consent.  I didn't

7   do it willingly.  I refused to try to let it happen and they

8   forced it upon me.  Something went inside my rectum, which

9   wasn't supposed to go in my rectum.  I'm saying it was a finger

10  because I was face down and that's what it felt like.  Then they

11  tried to put the baton in there.

12      By LaBarge's statement, I'm going to take it and you going

13  to like it one way or another, that's why I use the word rape.

14  That's what I mean by it.

15  Q.   Now, at the time that Mr. LaBarge was videotaping, there's

16  a point in the videotape where the camera is turned aside so we

17  can't see you when you're naked, right?

18  A.   Yes.

19  Q.   Did LaBarge see you when you were naked?

20  A.   Yes.

21  Q.   Did he say anything afterwards regarding your body?

22  A.   He going to get me, that's it.

23  Q.   He said he was going to get you?

24  A.   Yes.

25  Q.   How long were you in that room before they stopped coming

1  in?

2  A.   I was in there, like, approximately two hours.  It was

3  from, like, 6:00 to, like, 8:00, 8:05.

4  Q.   Did they do anything else to you when they came in those

5  times?

6  A.   Besides physically assault me, I got cuts, burns, bruises

7  on my body.

8  Q.   When you say burns, what do you mean?

9  A.   Like, rug burns or lacerations and so forth.  Like, I can't

10  explain it.  There wasn't no rug, there was just friction that

11  caused bleeding on my arm and my skin -- pulling my skin back.

12  Q.   And where did the friction come from?

13  A.   From them pulling me back on the floor assaulting me.

14  Q.   And you said that they hit the bottom of your feet?

15  A.   Yes.

16  Q.   Did you have any bleeding?

17  A.   Yes.

18  Q.   Where were you bleeding?

19  A.   From my feet and my nose, my nostril.

20  Q.   Your nose was bleeding?

21  A.   Yes.

22  Q.   Where on your feet were you bleeding?

23  A.   The bottom of my feet and the left side.  My left foot, my

24  left side, due to them breaking the bone and the bone piercing

25  through my skin.

1  Q.  So you said that there was a bone sticking out of your

2  foot?

3  A.  Yes.

4  Q.  And it was bleeding?

5  A.  Yes.

6  Q.  So then what happened, did they take anything from you?

7  A.  My wedding ring.

8  Q.  Well, in the video it sounds like the lieutenant says that

9  you can keep your wedding ring.

10  A.  Yes, he said due to the unit chief or -- the watch

11  commander called the physician mental health civilian that I'm

12  able to keep it.  Lamare and LaBarge is the main two who took

13  the wedding ring off the last time they came in the room.

14  Q.  Did they say anything to you when they took your ring?

15  A.  They didn't say nothing, they just told me they're going to

16  take it.

17  Q.  How long were you in there that weekend?

18  A.  I was there from Saturday, Sunday, Monday to, like, 10:00

19  in the morning.

20  Q.  During that time you were in there on Saturday, Sunday, and

21  Monday morning did you see any doctor?

22  A.  No, besides -- Monday, I saw the physician.  And then after

23  I seen the -- excuse me, not the physician, the unit chief.

24  After I seen the unit chief for OMH, I seen the nurse that you

25  see in the video, Kowalchuk, with a sergeant.  They came, took

1    the photos, and she told me she's going to give me something

2    later on and she didn't tell them.

3              MS. BOSMAN:  Can we mark these, please?

4              THE COURTROOM DEPUTY:  Marked for identification

5    Plaintiff's Exhibits 36, 37, and 38.

6              MS. BOSMAN:  Thank you.  Thank you.  May I approach

7    the witness, your Honor?

8              THE COURT:  You may.

9    Q.   Handing you what has been marked as Plaintiff's Exhibits

10   36, 37, and 38.  Could you identify for the jury, please, what

11   is Exhibit 36?

12   A.   Exhibit 36 is of the burns and the lacerations on my arm.

13   Q.   When was that photograph taken?

14   A.   That Monday after the incident, November 17, 2014.

15   Q.   Who took that photograph?

16   A.   Nurse Kowalchuk -- Holcombe.

17   Q.   Nurse Holcombe?

18   A.   Yes.

19   Q.   And what is Exhibit 37?

20   A.   The photos of the scars and the marks on my back.

21   Q.   And what is -- do you know when that photo was taken?

22   A.   The same day as the first one, on November 17, 2014.

23   Q.   And what about Exhibit 38, what is that?

24   A.   Photos of the front of me of the bruises on my chest area.

25   And that was tooken the same day, November 17, 2014.

1  Q.  Mr. McMaster, have you ever seen color copies of those

2  photographs?

3  A.  No, I have not.

4  Q.  How did you obtain those black and white copies of those

5  photographs?

6  A.  Due to the fact of medical and the defendants -- during the

7  discovery with the hearing packets.

8  Q.  Did you have any question in your mind that those

9  photographs were taken of you on November 17th of 2014?

10  A.  No, I do not.

11  Q.  Were you ever in an OMH solitary -- withdrawn.

12      Were you ever in the infirmary in the OMH room on any other

13  occasion in which you were injured?

14  A.  No, I was not.

15          MS. BOSMAN:  Your Honor, we offer those exhibits.

16          THE COURT:  Any objection?

17          MR. MATULA:  Yes, your Honor, foundation and

18  authentication.  For the record, we've advised counsel that

19  these were not disclosed by the Attorney General's Office

20  because this does not pertain to the same incident as we're here

21  today for.

22          THE COURT:  Well, your people took the photographs,

23  so Plaintiff's 36, 37, and 38 are received.  And you may show

24  them to the jury on the machine over here --

25          MS. BOSMAN:  Thank you, your Honor.

1          THE COURT:  -- so that everyone can see them.

2          (Whereupon, Plaintiff's Exhibits 36, 37, and 38 were

3    received in evidence.)

4    Q.   For the record, this is exhibit -- let's see, Plaintiff's

5    Exhibit 36.  Now, Mr. McMaster, are those your arms?

6    A.   Yes, they are.

7    Q.   And are those your hands?

8    A.   Yes, they are.

9    Q.   And do you have a wedding ring on in this picture?

10   A.   No, I do not.

11   Q.   It's very difficult to tell from this photograph, as you

12   can see, but can you describe where you had injuries on that

13   date and at that time?

14   A.   The bottom arm, I have it around my wrist area and going

15   above my forearm to my bicep.  The top arm, from my wrist area

16   going up -- straight up to my elbow.  My bottom arm, you could

17   see that my knuckle has been pushed back on my right hand.

18   Q.   Which knuckle, Mr. McMaster?

19   A.   My ring finger.

20   Q.   So this finger right here?

21   A.   Yes, that's from the baton.

22   Q.   But that's not the ring finger that you had your wedding

23   band on, is it?

24   A.   No.

25   Q.   What finger did you have your wedding band on?

1   A.   The upper hand on my ring finger.

2   Q.   Do you have your wedding ring on as you sit here today?

3   A.   Yes, I do.

4   Q.   Can you show it to the jury which hand you have it on?

5   A.   My left hand.

6   Q.   And which finger do you have it on?

7   A.   My middle finger.

8   Q.   Why?

9   A.   Because my left finger was broken and it's loose.

10   Q.   Your ring finger?

11   A.   No.

12   Q.   So you can no longer wear your wedding ring on your ring

13   finger?

14   A.   Yes.

15   Q.   Does that have anything to do with what occurred to you on

16   November 15th?

17   A.   Yes.

18   Q.   And what is that?

19   A.   That's when they was forcing the ring off my finger.  It

20   occurred with the incident, my hand.

21        MS. BOSMAN:  Let the record reflect that I'm now

22   publishing Plaintiff's Exhibit 37.

23   Q.   Can you describe what appears to be in Plaintiff

24   Exhibit 37, Mr. McMaster?

25   A.   That's the front of me with the smock -- the smock on my

1  waist, wrapped around my waist.  Behind me is the window to the

2  outside.  To the right of me, the left of us, that's the sink

3  and the toilet.  And to the right, which is the left from me in

4  the picture, is the bed and the mat that was on the floor

5  earlier in the corner.

6  Q.  Now, who's taking these photographs again?

7  A.  The nurse through the window of the observation room that

8  they had me.

9  Q.  So the nurse is taking the photograph, as I understand it,

10  from outside the room?

11  A.  Yes.

12  Q.  Through the glass?

13  A.  Yes.

14  Q.  Why didn't she just come in and take the photographs in the

15  room?

16           MR. MATULA:  Objection, speculation.

17           THE COURT:  Sustained.

18  Q.  Do you know why she didn't take the photographs in the

19  room?

20  A.  No, I do not.

21  Q.  Can you describe for the jury what injuries you had that

22  could be seen in Exhibit 37 --

23  A.  Shoulder burns --

24  Q.  -- I'm sorry, that's Exhibit 38 -- no, these are both

25  marked 37.  I've got two marked 37, sorry.  Go ahead.

1  A.   It's the shoulder burn and the scratches on my chest and

2  my -- the front of my arm.

3  Q.   Showing you what we will mark as Plaintiff's Exhibit 38,

4  can you describe what can be seen in that photograph?

5  A.   That's my back.  That's the photo of my back and my lower

6  back where it had been cut, scratched.  And I got the bruises on

7  my shoulders, the back of my shoulders, as well as prints from

8  boots or footwear that's on my back from the incident.

9  Q.   I'm going to go back to Exhibit P-37 again.  These two

10 photographs, 37 and 38 were taken in the same room?

11 A.   Yes, they was.

12 Q.   Do you notice anything in the corner of Exhibit 38 that's

13 not in the corner of Exhibit 37?

14 A.   Yes, the mat.

15 Q.   And why is the mat moved?

16 A.   Because they told me to put it on the bed on the mattress.

17 Q.   Did they tell you to put it on the bed -- on the mattress

18 in between taking these two paragraphs?

19 A.   Yes.

20 Q.   Do you know if there were any more than three photographs

21 taken?

22 A.   Yes, there should have been, I think, four.

23 Q.   Where's the fourth photograph?

24 A.   I have no idea.

25 Q.   Did you have a copy of it?

1    A.   Everything they gave me I had in another trash bag, which

2    my other trash bag mysteriously disappeared.

3    Q.   Did you tell anyone what happened to you?

4    A.   Yes.

5    Q.   Who'd you tell?

6    A.   Lieutenant Tatro, Sergeant Rowe at that time, medical, the

7    dep.  I asked out to everybody that walked past my cell when I

8    went back to my cell November 17th, which was that Monday, as

9    well as the unit chief.  I had told mental health, as well,

10   about the whole scenario.  They told me they was going to check

11   into it.  I spoke to grievance about it and the deacon.  I

12   stopped everybody every time they went by my cell and addressed

13   that issue.

14   Q.   The November 18th -- November 18th grievance that you

15   wrote, which was Exhibit 27, who did you give that to?

16   A.   I gave it to the corrections officer to drop in the

17   mailbox.

18   Q.   And is it your understanding that the grievance is dropped

19   in the mailbox the same day as it's given to a correction

20   officer?

21   A.   Yes.

22           THE COURT:  Move the mic close and speak up.

23   Q.   I'm sorry.  When you place a grievance in the care of a

24   corrections officer, they put it in a mailbox?

25   A.   They supposed to put it in the mailbox.

1    Q.    Is it in an envelope?

2    A.    Yes.

3    Q.    Is it sealed?

4    A.    Yes.

5    Q.    So Exhibit 27 was in an envelope sealed?

6    A.    Yes.

7    Q.    And you kept a copy of it?

8    A.    Yes.

9    Q.    How did you make a copy?

10   A.    They give you carbon paper.

11   Q.    So you used a carbon paper and made a copy?

12   A.    Yes.

13   Q.    So Exhibit 27 is a carbon copy of the grievance you

14   submitted on November 18th of 2014?

15   A.    Yes.

16   Q.    And is it your custom and practice to make carbon copies of

17   all your grievances or any communication that you -- any

18   correspondence that you send?

19   A.    Not all, but, yes, the majority.

20   Q.    Did anyone come to see you about your grievance?

21   A.    Nobody.  I spoke to the DSA, the dep of security about it.

22   They told me they were going to send somebody to speak to me and

23   nobody ever came and spoke to me about it.

24         MS. BOSMAN:  May I approach the witness?

25   Q.    Handing you again Exhibit P-27, could you just read for the

1   jury the description of the problem that you wrote on

2   November 18th of 2014?

3   A.   Description of the problem is on November 15, 2014,

4   Saturday night around 6:05 p.m. to 8:30 p.m. inside the

5   infirmary (OMH) room 4-115A and 4-116A, I had been raped and

6   physically assaulted by Correction Officers L.W. LaBarge, S.

7   Lamare, E. Smith, and several other correction officers.  There

8   is cameras down there that will prove this.  I would also like

9   for them -- and the escort video to be preserved for review and

10  documentations.  I've stopped every nurse, sergeant, lieutenant,

11  and the deacon about the situation and still no photos was taken

12  of all these burns, scars, and cuts on my body.  My hand broke,

13  left foot broke, right foot swollen, bruises still on my legs,

14  arms, hands, feet, and back from the incident (November 15,

15  2014).

16  Q.   Why are you saying no photos were taken?

17  A.   Because she the only one who took them and when I asked

18  about it, they wasn't -- they did not exist, nurse Holcombe.

19  Q.   So you asked about the photos before November 18th?

20  A.   After.

21  Q.   No, in this grievance, you say no photos were taken?

22  A.   Yes.

23  Q.   You just told us photos were taken.

24  A.   Which we showed you.  Because I asked the dep, I asked the

25  nurse where's the photos at, and she told me that they not

1   there.

2   Q.   You mean before you left the infirmary, you asked for the

3   photographs?

4   A.   Yes.

5   Q.   Who did you ask specifically for the photographs in the

6   infirmary?

7   A.   The nurse and the unit chief.

8   Q.   Who's the unit chief?

9   A.   Kemp.  That's the OMH unit chief.

10  Q.   And what were you told?

11  A.   That no photos was --

12          MR. MATULA:  Objection, hearsay.

13          THE COURT:  Overruled.  Go ahead.

14  A.   No photos have been tooken.

15  Q.   So when's the first time that you were able to obtain those

16  copies?

17  A.   During the discovery and the hearing.

18  Q.   All right.  Why did you say in your grievance that there

19  are cameras down there?

20  A.   Because I was told that there was cameras down there and

21  there's little black balls in the ceiling that appears to be

22  cameras.

23  Q.   Inside the actual OMH infirmary room you were in?

24  A.   No, outside the door pointing in --

25  Q.   Okay.  So you knew there were no cameras in the actual room

1    you were in when you were assaulted, correct?

2    A.   Yes, after we got down there.

3    Q.   Did you request a copy of the video of you being escorted

4    on the 17th when you were brought back to your cell from the

5    infirmary?

6    A.   Yes.

7    Q.   And what were you told?

8    A.   That they don't --

9              MR. MATULA:  Objection, hearsay.

10             THE COURT:  Overruled.

11   A.   That they do not exist.

12   Q.   Why did you want a copy of the video of you being escorted

13   from the infirmary back to your cell on the 17th of November?

14   A.   Because it would show that the way I went down there and

15   the way that I came back was two different things to prove that

16   I been assaulted and raped while I was down in the infirmary.

17   Q.   What was different about the way that you came back from

18   the infirmary than the way you went down?

19   A.   I was limping, my hair was messed up, my hand was swollen,

20   my face was different.

21   Q.   Who escorted you from the infirmary back to your cell on

22   November 17, 2014?

23   A.   A sergeant and two officers.

24   Q.   Do you remember their names?

25   A.   No, I do not.

1   Q.   Did you tell them about what happened to you?

2   A.   No, I only spoke to the sergeant.

3   Q.   Did you receive any medical treatment for your foot?

4   A.   No, I did not.

5   Q.   And you said it was bleeding?

6   A.   Yes.

7   Q.   Did you do anything for your foot yourself?

8   A.   Yes.

9   Q.   What did you do?

10  A.   I washed it and wrapped it up with a shirt and a sock.

11  Q.   What was on your foot when you went back to your cell?

12  A.   Socks and my boots.

13  Q.   All right.  Your clothing was removed from you while you

14  were in the cell, correct?

15  A.   Yes.

16  Q.   So who gave you something to wrap on your foot while you

17  were in the cell?

18  A.   Nobody.  I did not get no medical treatment at all while I

19  was in that cell.  When I came out that cell and went to my

20  regular cell in nine building, that's when I tended the injury

21  on my foot.

22  Q.   Who is the deacon?

23  A.   I have no idea of his name.

24  Q.   When you say deacon, you mean a religious person?

25  A.   Yes, the chaplain or someone in that nature.

 1  Q.  And what was the action that you requested as part of your

 2  grievance on November 18, 2014?

 3  A.  For me to get examined by a real doctor, a rape kit test to

 4  be done, and for the officers that ran into my cell slash room

 5  to be investigated and no longer have any jobs at Upstate

 6  Correctional Facility, for this to be investigated, for me to

 7  move out of this facility due to the fact I fear for my life and

 8  I'm having bad dreams about this and it's messing with me

 9  mentally.

10  Q.  Did someone come to you and give you a rape kit test?

11  A.  No.

12  Q.  Were you ever tested with a rape kit?

13  A.  No.

14  Q.  Are you familiar with what a rape kit test is?

15  A.  No.

16  Q.  Well, how did you know to ask for one?

17  A.  Because when I told the deacon, the deacon had gave me that

18  knowledge.

19          MR. MATULA:  Objection, hearsay.

20          THE COURT:  Overruled.  Go ahead.

21  A.  The deacon had gave me that knowledge.  He said if

22  something happened to you such as that nature, then medical must

23  provide you with that test.

24  Q.  As you sit here today, do you have an understanding of what

25  kind of test a rape kit would give you?

1   A.   Yes.

2   Q.   What is your understanding?

3   A.   It would prove that something been -- had happened, that

4   you've been raped or DNA, in that nature.

5   Q.   Did you have any semen on you?

6   A.   I have -- at that moment, I have no idea.

7   Q.   Did you have any tears or bleeding from your rectum?

8   A.   Yes, I did.

9   Q.   Did you have that in the infirmary?

10  A.   Yes.

11  Q.   Did you report that to any medical person after?

12  A.   Yes.

13  Q.   Did you receive any exam?

14  A.   No, I hadn't -- not until, like, ten days later when the PA

15  Kowalchuk just told me inside the little room to bend over and

16  spread my cheeks.  She looked and then just told me to get up.

17  Q.   Mr. McMaster, I want to have a clear understanding, what

18  happened with respect to your exam before they put you in the

19  room, when you were taking off your clothes and you showed

20  behind your ears and you were told to bend over and spread your

21  cheeks?

22  A.   Yes.

23  Q.   Do you recall that?

24  A.   Yes.

25  Q.   What's that referred to?

1    A.   A strip frisk.

2    Q.   A strip frisk?

3    A.   Yes.

4    Q.   Did you receive a strip frisk at any time before you went

5    back to your cell on November 17th?

6    A.   No, I have not.

7    Q.   So between November --

8    A.   14th.

9    Q.   -- 14th and November 17th, they didn't do another strip

10   frisk?

11   A.   No, they did -- the incident was November 15th.

12   Q.   Excuse me.  Yes, November 15th.

13   A.   Yes, that was it.  Only one time, never again.

14   Q.   Now, there's a type of search that an inmate can undergo

15   that includes penetration of the rectum, correct?

16   A.   Yes.

17   Q.   And what's that called?

18   A.   It's called a cavity search.

19   Q.   Did you -- were you advised at any time that the defendants

20   intended or were going to conduct a cavity search?

21   A.   No.

22   Q.   Was there any allegation against you at any time that you

23   were hiding contraband inside your rectum?

24   A.   No.

25   Q.   What the defendants LaBarge, Lamare, and Ellsworth did to

 1  you on November 15, 2014, was that a cavity search?

 2  A.   No.

 3           MS. BOSMAN:  May I approach the witness?

 4           THE COURT:  You may.

 5  Q.   Handing you what has been marked as Plaintiff's Exhibit 29.

 6  Do you recognize that document?

 7  A.   Yes.

 8  Q.   Do you know who J.L. Uhlerich is?

 9  A.   Uhlerich?

10  Q.   Uhlerich.

11  A.   Yes.

12  Q.   Who is that?

13  A.   That's the -- one of the psychiatric doctors, like, the

14  civilians that come do social work for mental health.

15  Q.   I believe Exhibit 29 is two pages, correct?

16  A.   Yes.

17  Q.   And what is the second page of Exhibit 29?

18  A.   Social worker to J. Uhlerich, McMaster notified me someone

19  stuck a finger in his ass, I notified unit chief Tim Kemp.

20  Q.   Am I correct that you spoke to J. Uhlerich?

21  A.   Yes.

22  Q.   Do you remember him?

23  A.   Yes.

24  Q.   Do you remember when you spoke to him?

25  A.   I spoke to him within that timeframe before I seen the PA

1   Kowalchuk.

2            MS. BOSMAN:  Your Honor, we offer Exhibit 29.

3            THE COURT:  Any objection?

4            MR. MATULA:  No, your Honor.

5            THE COURT:  Received.

6            (Whereupon, Plaintiff's Exhibit 29 was received in

7   evidence.)

8   Q.   Mr. McMaster, prior to November of 2014, had you ever

9   received any antidepressants or any kind of mental health

10  treatment?

11  A.   No, I had not.

12  Q.   Following November of 2015 -- 2014, did you receive any

13  mental health treatment?

14  A.   After, yes.

15  Q.   In 2015, did you see any kind of psychological or

16  psychiatric specialists?

17  A.   Yes.

18  Q.   Why?

19  A.   Due to that November 14th incident --

20  Q.   Well --

21  A.   -- 15th incident.

22  Q.   -- tell the judge what happened to you after you were

23  assaulted.

24  A.   It been messing with me mentally.  Every time walkie

25  talkies -- or they mention they got to bring me down to that

1   area and it involving me, I was having nightmares, bad dreams.

2   And the mental health people told me that's a sign of, like,

3   symptoms of PTSD after something traumatic happens.

4           MR. MATULA:  Objection, hearsay.

5           THE COURT:  Don't just tell them what people told

6   you, it's what you felt.  Unless we're going to back up with the

7   doctor, we can't have you telling what the doctor said.  And you

8   don't have a doctor to testify, so just tell what you felt and

9   what happened to you.

10  A.   I'd been going back and forth, I wasn't getting no rest.  I

11  been feeling depressed and it'd just been messing with me

12  mentally.  Like, every time certain ones walk by or that whistle

13  blow, it triggers that day.  It brings back that day and it just

14  keeps playing over and over in my head.

15       And I spoke to them about it and they diagnosed me and then

16  they gave me medication for such treatment.

17  Q.   What medication did you get?

18  A.   They gave me Vistaril, Remeron, and Celexa.

19  Q.   You wrote a number of letters outside of the infirmary --

20  outside of the facility, correct?

21  A.   Yes.

22  Q.   Did you continue to have any contact with Officer LaBarge

23  or Lamare or --

24  A.   Ellsworth.

25  Q.   -- Ellsworth --

1  A.   Yes.

2  Q.   -- after the incident in the infirmary?

3  A.   Yes.

4  Q.   Can you tell the jury what interaction you had with them

5  after the incident in the infirmary?

6  A.   They kept coming by my cell harassing me, telling me how do

7  you like it, saying that they should've killed me when they had

8  the chance down there, I'm still filing grievances, which is the

9  complaints about them, and I need to stop, something going to

10 happen, they going to get back at me and assault me again, the

11 cameras don't work, I should've learned my lesson.

12      And it's been an ongoing thing.  I've been writing to

13 Governor Cuomo, I done wrote to Albany about.  I been writing

14 everybody telling them it's an ongoing thing.  They even went to

15 my neighbors telling them don't care for me, if I asked them to

16 send a letter out to my family, don't do it, they're not going

17 to do nothing with it.

18      They've been playing with my meals and they was trying to

19 stop all my grievances and my letters going out to my family to

20 report this incident.  And they kept writing falsified

21 misbehavior reports over and over just so they can keep me in

22 the SHU longer.  And I was supposed to get out within ten months

23 after I got there this time and it extended my SHU time from

24 November 2014 all the way to 2017 due to the fact of the

25 misbehavior reports.

1      You've got Lieutenant Rowe, he became a lieutenant and he

2  did a couple hearings on me dealing with these officers in

3  Upstate Correctional Facility who's friends with LaBarge,

4  Ellsworth, and Lamare, due to retaliation for me writing them up

5  and complaining about this.

6           MS. BOSMAN:  May I approach the witness?

7  Q.  Handing you what has been marked as Plaintiff's Exhibit 33

8  and 34 for identification.

9           MS. BOSMAN:  Your Honor, I don't recall, did I offer

10  Exhibit 29?

11           THE COURTROOM DEPUTY:  Yes.

12           MS. BOSMAN:  29's in?

13           THE COURT:  And these are 33 and 34?

14           MS. BOSMAN:  Yes.

15  Q.  Could you identify 33 and 34, please, Mr. McMaster?

16  A.  Exhibit 33 is the letter I just was telling you all about

17  to Mr. Cuomo with the grievances enclosed and about the

18  November 15th incident.

19      And Exhibit 34 is the disposition and my sanctions.  It's a

20  UI report, which is an unusual incident report for the

21  misbehavior reports that they write.  And it's a disposition

22  that I was explaining to y'all earlier about the special

23  housing, loss of packages, commissary, and phone that they give

24  you when you go to the hearing for any ticket they write.

25  Q.  Now, Exhibit -- which one's the letter to Governor Cuomo?

1   A.   33.

2   Q.   Exhibit 33, it says you were raped, physically assaulted,

3   at Upstate?

4          THE COURT:  Wait a minute.  Wait a minute.  Wait a

5   minute.

6          MS. BOSMAN:  I'm sorry, it's not -- I'm sorry.  Yeah,

7   you're right, your Honor.  End of the day.

8   Q.   Did you keep carbon copies of these letters and these

9   grievances that are attached?

10  A.   Yes.

11         MS. BOSMAN:  Your Honor, we offer the Exhibits 33 and

12  34.

13         THE COURT:  Any objection?

14         MR. MATULA:  No objection, Judge.

15         THE COURT:  Plaintiff's 33 and 34 were received.

16         (Whereupon, Plaintiff's Exhibits 33 and 34 were

17  received in evidence.)

18         THE COURT:  Now you may go into the details.

19         MS. BOSMAN:  Thank you, your Honor.

20  Q.   On the first page of the letter to Governor Cuomo, it says

21  you were assaulted here at Upstate Correctional Facility on what

22  date?

23  A.   On November 15, 2014.

24  Q.   And then it says that you didn't receive a grievance

25  number.  And you're talking about the first grievance you filed,

1    right?

2    A.    Yes.

3    Q.    And that was the one on November 18th?

4    A.    That was the November 18th incident and the November 25th

5    when I saw the PA Kowalchuk.

6    Q.    Okay.  When you say November 18th incident, it sounds like

7    you had an incident on November 18th.

8    A.    No, November 18th grievance from the November 15th

9    incident.

10   Q.    Okay.  And you enclosed a copy of a November 25th

11   grievance --

12   A.    Yes.

13   Q.    -- with the letter to Governor Cuomo?

14   A.    Yes.

15   Q.    Did you receive any response by November 25th to either

16   your November 18th grievance or your November 25th grievance?

17   A.    No, I did not.

18   Q.    Okay.  Well, you indicate in your November 25th grievance

19   that you saw a Physician's Assistant, correct?

20   A.    Yes.

21   Q.    So wasn't that in response to your grievance that you had

22   been raped and assaulted on November 18th, that November 18th

23   grievance?

24   A.    That was in response to me stopping the DSA, Ms. Danforth,

25   and she told me she was going to make sure somebody see me.  And

1    then she came back, told me that I was going to see the PA about

2    such incident with my grievance.  And that's when this nurse --

3    the PA nurse had did the regular spread and bend at the waist

4    and spread them exam.

5    Q.   What do you mean by that?  Could you be more -- offer the

6    jury more --

7    A.   All she told me --

8    Q.   Wait, let me finish because she can't do as well.

9        Tell the jury exactly who you saw and what you said to her

10   and what she said to you.

11   A.   On November 25th, I saw the PA Kowalchuk.  I went in the

12   room, I explained to her about the incident of them physically

13   assaulting me and raping me on the 15th of November.  She told

14   me what could she do.  That's exactly -- her response was, what

15   can I do.  I said, you're a PA, you could assess to see what's

16   going on.  I requested the rape kit test and so forth and

17   everything about my foot, the bone sticking out of my foot, the

18   burns, the cuts, some ointment, band aids, whatever.

19       She told me to drop my pants, turn around, and spread my

20   butt cheeks.  She looked and then was like, all right, pull your

21   pants up, you good.  And she asked me who did it.  I explained

22   to her who did it and her statement was, you serious, you think

23   I'm going to lose my job and put my friends at risk at what's

24   going on, and sent me out the room.

25       And she cared about the wrist brace that you see in the

1  video for the medical reasons with the restraints.  She tried to

2  get them taken from me, forced the cell search upon me with

3  nurse Lordie and another sergeant and a lieutenant so they could

4  come in my cell and take it.  And that was all she cared about.

5  She didn't care about nothing else that dealt with that incident

6  on November 15th.

7  Q.  Did you specifically ask her to speak to her without the

8  COs in the room?

9  A.  Yes.

10  Q.  Why?

11  A.  Because I feared they might go back and tell LaBarge and

12  them something and there would be more retaliation.

13  Q.  And what did the -- is this a PA or a nurse?

14  A.  That's the PA.

15  Q.  What did the PA say in response to your request that the

16  COs be excused because you didn't feel safe talking around them?

17  A.  She said she don't care, they're going to stand right there

18  because I'm lying.  And then she told me -- she asked me to tell

19  her how I got raped and assaulted and I told her.

20  Q.  Were you lying?

21  A.  No, I was not.

22  Q.  Have you lied at all about being assaulted and raped on

23  November 15th of 2014?

24  A.  No, I did not.

25  Q.  How many people have you told about it?

1  A.   More than seven.  More than seven, which is the captain;

2  lieutenant, sergeant, dep, superintendent, I told all of them,

3  as well as the deacons and medical.

4            MS. BOSMAN:  That's all I have for today, your Honor.

5            THE COURT:  Are you finished with this witness?

6            MS. BOSMAN:  No, I'm not.

7            THE COURT:  Well, continue and let's see if we can

8  finish this witness today.

9            MS. BOSMAN:  Okay.

10           THE COURT:  I don't think we have too much longer

11 with him.  It seems we completed most of what he's testifying

12 to.

13           MS. BOSMAN:  I just want to make sure I got all of

14 the exhibits in, your Honor.

15           May I approach the witness?

16           THE COURT:  As I said, we're going to finish the

17 direct of this witness.  Of course, there will be the cross

18 tomorrow and redirect, so -- but we're going to finish this

19 direct exam and let's move it on.

20           And we'll have a redirect if you wish.

21           MS. BOSMAN:  Your Honor, the --

22 Q.   Did the medication you were provided by the doctor help you

23 with your symptoms you were experiencing as a result of the

24 assault?

25 A.   Yes, some -- to an extent.

1   Q.   And you were taking Remeron?

2   A.   Vistaril and Celexa.

3   Q.   Did you have any therapy with anyone regarding the assault?

4   A.   No, besides the mental health staff, Ms. Grabber, Theresa

5   Moore, and Ms. McKenzie.

6   Q.   And would you say that your symptoms are worse today or

7   better today than they were in 2015?

8   A.   '14?

9   Q.   You didn't receive any treatment until 2015; am I correct?

10  A.   Yes.

11  Q.   Okay.

12  A.   But --

13  Q.   Once the treatment started, did it help, I guess is my

14  question?

15  A.   I'll say yes, but it's an ongoing process.  They still

16  doing it as we speak now.

17  Q.   Okay.

18            MS. BOSMAN:  May I approach the witness?

19  Q.   Handing you what has been marked as Plaintiff's Exhibit 25.

20  Do you recognize those records?

21  A.   Yes.

22  Q.   Have you seen those documents before today?

23  A.   Yes.

24  Q.   And are these documents what's referred to as an ambulatory

25  health record progress note?

1  A.  Yes.

2  Q.  And do these records cover the time period that we're

3  referring to in November of 2014?

4  A.  Yes.

5  Q.  Can you direct me to which page?

6  A.  You have the big one on the bottom, 000199.

7  Q.  And do these also contain ambulatory health records

8  throughout 2015?

9  A.  No, it shows -- it shows up to, I believe, December of

10  2014.

11  Q.  Okay.  And to your knowledge, are these records complete?

12  Do they have everything in them?

13  A.  No, they do not.

14  Q.  What's missing?

15  A.  The sick call slips, which is provided in here, and photos.

16  Q.  Okay.  With the exception of the sick call slips and the

17  other entries that are missing, is this document complete, to

18  the best of your knowledge?

19  A.  Yes.

20          MS. BOSMAN:  Your Honor, we offer Exhibit 25.

21          THE COURT:  Any objection?

22          MR. MATULA:  No objection.

23          THE COURT:  Okay.  25 is received.

24          (Whereupon, Plaintiff's Exhibit 25 was received in

25  evidence.)

1          THE COURT:  And I guess we will let the jury go.

2   They're very surprised to be here today and you have been very

3   patient.  We appreciate it.  So I guess we will conclude the

4   direct examination of this witness tomorrow morning.  So you're

5   excused until tomorrow morning at 9:30.  That's when we'll

6   start.

7          Remember not to discuss the case when you go home or

8   with anyone else and not -- I doubt that there will be anything

9   in the newspaper or TV, but you never know, so don't watch it or

10  anything else.  If you want to come in a little early tomorrow,

11  we'll have coffee and things ready for you and we'll be --

12  hopefully we'll be starting at 9:30 and we'll continue with the

13  direct and then the cross exam of this witness.

14          Okay?  So you're excused with the thanks of the

15  Court.

16          (Jury Excused.  Time noted:  4:35 p.m.)

17          THE COURT:  And, counselors, we'll have a brief

18  conference in chambers before you leave.

19          (Court adjourned.  Time noted:  4:36 p.m.)

20

21

22

23

24

25

```
1

2                    CERTIFICATE OF OFFICIAL REPORTER

3

4

5          I, HANNAH F. CAVANAUGH, RPR, CSR, NYACR, Official U.S.

6    Court Reporter, in and for the United States District Court for

7    the Northern District of New York, DO HEREBY CERTIFY that

8    pursuant to Section 753, Title 28, United States Code, that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the above-entitled

11   matter and that the transcript page format is in conformance

12   with the regulations of the Judicial Conference of the United

13   States.

14

15          Dated this 27th day of June, 2019.

16

17        x  Hannah F. Cavanaugh

18           HANNAH F. CAVANAUGH, RPR, CSR, NYACR

19           Official U.S. Court Reporter

20

21

22

23

24

25
```